**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF**
**GEORGIA  ATLANTA DIVISION**

| | | |
|---|---|---|
| THOMAS "ENNIS" BRAGG, JR., | § § § | |
| Plaintiff, | § § | |
| v. | § § § | Civil Action No. <br> <u>1:24-cv-01464-AT</u> |
| CHARTER UP HOLDINGS, LLC, <br> ARMIR HARRIS, and LUIS <br> CARRANZA | § § § § § | |
| Defendants. | § | |

## DECLARATION OF ARMIR HARRIS

I, Armir Harris, hereby make the following declaration pursuant to the provisions of 28 U.S.C. § 1746:

1. I am over the age of eighteen and am fully competent to testify as to the matters set forth in this Declaration, which are true and correct based upon my own personal knowledge. I submit this declaration in support of the Motion to Dismiss filed by Defendant Charter Up Holdings, LLC now known as CharterUp Technologies, LLC ("CharterUP").

2. I am, and at all relevant times herein was, employed as the Chief Executive Officer  of CharterUp.

1

3.      As part of my duties, I am familiar with the corporate structure and ownership of CharterUp, CharterUp's incentive plan[s], including the incentive plan at issue in this proceeding, and other certain other corporate matters relating to CharterUp and its subsidiaries and affiliates.

4.      CharterUP is a private company, owned by its founders, certain employees and certain  investors. CharterUP is a limited liability company organized under the laws of Delaware.  In December 2021 Charter Up Holdings, LLC merged with and into CharterUp Technologies, LLC, the surviving entity.

5.      At times relevant to Plaintiff and the claims at issue in this lawsuit, CharterUP offered, subject to certain terms and conditions including, but not limited to, vesting conditions and continued employment applicable to participation in the "CharterUP Holdings, LLC 2019 Unit Incentive Plan" ("Unit Incentive Plan") to certain employees, including Plaintiff, wherein such employees were entitled to, the grants, vesting and exercise of options including Non-Qualified Options, the "Unit Options", which are at issue in this proceeding. *See* Unit Incentive Plan page 1 and section 7.2.  A true and accurate copy of the Unit Incentive Plan in effect at the time of the grant is attached hereto as Exhibit A.

6.      The Unit Options made available to Plaintiff during his employment with CharterUP were made pursuant to the terms and conditions of the Unit Incentive

Plan and pursuant to the terms of the CharterUP Holdings, LLC 2019 Unit Incentive Plan Option Agreement (the "Incentive Plan Option Agreement") with Plaintiff. A true and accurate copy of Plaintiff's Incentive Plan Option Agreement is attached hereto as Exhibit B.

7.      The CharterUP Unit Incentive Plan was never established, sponsored or maintained an "employee benefit plan" as defined in ERISA §3(3). In fact, the Unit Incentive Plan – under the "Terms & Conditions of Deferred Units" – at Section 7.5(h) states:

> *No ERISA Employee Benefit Plan Created. Except to the extent that the Board expressly determines otherwise in resolutions, a Deferred Unit must contain terms and provisions designed to ensure that the Deferred Unit will not be considered an "employee benefit plan' as defined in ERISA §3(3).*

8.      The CharterUP Board of Managers (the "Board") has never determined in resolutions or otherwise that the Deferred Units at issue in this proceeding, the Unit Options set forth in Plaintiff's Incentive Plan Option Agreement, were to be considered an employee benefit plan as defined in ERISA §3(3).  Moreover, the Board never otherwise in resolutions modified the Unit Incentive Plan such that it would be considered an "'employee benefit plan' as defined in ERISA §3(3)."

9.      Annexed as Exhibit C is a true and correct copy of the complaint filed in the Superior Court of Fulton County, Georgia, Case No. 2023CV382448 that is the

subject of the instant motion to dismiss.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: April 3, 2024.

_Armir Harris_
_____
Armir Harris, Chief Executive Officer
CharterUp Technologies, LLC
successor to
Charter Up Holdings, LLC

4

# EXHIBIT A

# CHARTER UP HOLDINGS, LLC
# 2019 UNIT INCENTIVE PLAN

Option grant ES-10 for Thomas Louis Bragg

## CHARTER UP HOLDINGS, LLC 2019 UNIT INCENTIVE PLAN

**1    PURPOSE**

The purpose of this Plan is to promote the interests of the Company, and any Parent or Subsidiary thereof, by providing the opportunity to purchase or receive Units or to receive compensation that is based upon appreciation in the value of Units to Eligible Recipients in order to attract and retain Eligible Recipients and providing Eligible Recipients an incentive to work to increase the value of Units and a stake in the future of the Company that corresponds to the stake of each of the Company's Unit holders. The Plan provides for the grant of Non-Qualified Options, Restricted Unit Awards, Deferred Units and Unit Appreciation Rights to aid the Company, and any Parent or Subsidiary thereof, in obtaining these goals.

**2    DEFINITIONS**

Each term set forth in this Section shall have the meaning set forth opposite such term for purposes of this Plan and any Unit Incentive Agreements under this Plan (unless noted otherwise), and for purposes of such definitions, the singular shall include the plural and the plural shall include the singular, and reference to one gender shall include the other gender. Note that some definitions may not be used in this Plan, and may be inserted here solely for possible use in Unit Incentive Agreements issued under this Plan.

**2.1    Amendment Date** means, with respect to any amendment to this Plan pursuant to Section 12 referenced in Section 9.1, the earlier of (1) date on which this Plan is so amended by the Board, or (2) the date on which such amendment is approved by the Unit holders.

**2.2    Board** means the Board of Managers of the Company.

**2.3    Business** means the business of creating 3D models and mapping output from captured images to assist asset owners and inspectors with critical infrastructure, inspection and reporting, while utilizing advanced analytics and artificial intelligence.

**2.4    Cause** shall mean an act or acts by an Eligible Recipient involving (a) the use for profit or disclosure to unauthorized Persons of confidential information or trade secrets of the Company, a Parent or a Subsidiary, (b) the breach of any contract with the Company, a Parent or a Subsidiary, (c) the violation of any fiduciary obligation to the Company, a Parent or a Subsidiary, (d) the unlawful trading in the securities of the Company, a Parent or a Subsidiary, or of another entity based on information gained as a result of the performance of services for the Company, a Parent or a Subsidiary, (e) a felony conviction or the failure to contest prosecution of a felony, or (f) willful misconduct, dishonesty, embezzlement, fraud, deceit or civil rights violations, or other unlawful acts.

**2.5    Change of Control** means either of the following:

**(a)**    any transaction or series of transactions pursuant to which the Company sells, transfers, leases, exchanges or disposes of substantially all (*i.e.,* at least eighty-five percent (85%)) of its assets for cash or property, or for a combination of cash and property, or for other consideration; or

**(b)**    any transaction pursuant to which Persons who are not current Unit holders of the Company acquire by merger, consolidation, reorganization, division or other business combination or transaction, or by a purchase of an interest in the Company, an interest in the Company so that after such transaction, the Unit holders of the Company immediately prior to such transaction no longer have a controlling (*i.e.,* more than 50%) voting interest in the Company.

However, notwithstanding the foregoing, in no event shall an Initial Public Offering of the Company's Units constitute a Change of Control.

**2.6    Change of Control Value** of a Unit, with respect to a Change of Control, shall mean the Fair Market Value of a Unit as of the date of such Change of Control as determined by the Board in its complete and absolute discretion; *provided, however,* in determining such Fair Market Value, the Board shall **not** take into account any "change of control consideration" which is escrowed and paid at a date later than the Change of Control or which is subject to an "earn out" provision with post-Change of Control performance contingencies. The intent is that in determining Change of Control Value, the Board may make a subjective determination of the Fair Market Value of a Unit **without** taking into account amounts that may be paid for a Unit at a point in time occurring later than the date of the Change of Control, which will eliminate issues associated with deferred

compensation.  For purposes of this Section 2.6, the term "change of control consideration" shall mean, with respect to a Change of Control, all cash, debt or equity securities and other property paid or issued by an acquiring Person to the Company and/or its Unit holders in consideration for such Change of Control.

2.7     **Code** means the Internal Revenue Code of 1986, as amended.

2.8     **Committee** means any committee appointed by the Board to administer the Plan, as specified in Section 5.3 hereof.

2.9     **Company** means Charter Up Holdings, LLC, a Delaware limited liability company, and any successor to such organization.

2.10    **Confidential Information** means (a) information of the Company, or any Parent or Subsidiary thereof, to the extent not considered a Trade Secret under applicable law, that (i) relates to the business of the Company, or any Parent or Subsidiary thereof, (ii) possesses an element of value to the Company, or any Parent or Subsidiary thereof, (iii) is not generally known to the Company's competitors (or a competitor of any Parent or Subsidiary thereof), and (iv) would damage the Company, or any Parent or Subsidiary thereof, if disclosed, and (b) information of any third party provided to the Company, or any Parent or Subsidiary thereof, which the Company, or any Parent or Subsidiary thereof, is obligated to treat as confidential, including, but not limited to, information provided to the Company, or any Parent or Subsidiary thereof, by its licensors, suppliers, Customers, or Prospective Customers.   Confidential Information includes, but is not limited to, (i) future business plans, (ii) the composition, description, schematic or design of products, future products or equipment of the Company, or any Parent or Subsidiary thereof, or any third party, (iii) communication systems, audio systems, system designs and related documentation, (iv) advertising or marketing plans, (v) information regarding independent contractors, employees, clients, licensors, suppliers, Customers, Prospective Customers, or any third party, including, but not limited to, Customer lists and Prospective Customer lists compiled by the Company, or any Parent or Subsidiary thereof, and Customer and Prospective Customer information compiled by the Company, or any Parent or Subsidiary thereof, and (vi) information concerning the Company's, or any Parent or Subsidiary's, or a third party's financial structure and methods and procedures of operation.  Confidential Information shall not include any information that (i) is or becomes generally available to the public other than as a result of an unauthorized disclosure, (ii) has been independently developed and disclosed by others without violating the legal rights of any party, or (iii) otherwise enters the public domain through lawful means.

2.11    **Contact** means, with respect to a Participant, any interaction between such Participant and a Customer or Prospective Customer which takes place in an effort to establish, maintain, and/or further a business relationship on behalf of the Company, and any Parent or Subsidiary thereof.

2.12    **Continuous Service** means the absence of any interruption or termination of service as an Employee or Key Person.  Continuous Service shall not be considered interrupted in the case of (i) sick leave; (ii) military leave; (iii) any other leave of absence as approved by the Board or the chief executive officer of the Company, or any Parent or Subsidiary thereof, provided that such leave is for a period of not more than ninety (90) days, unless reemployment upon the expiration of such leave is guaranteed by contract or statute, or unless provided otherwise pursuant to Company, or any Parent or Subsidiary thereof, policy adopted from time to time; or (iv) transfers between locations of the Company, or any Parent or Subsidiary thereof, or between Company, a Parent, or a Subsidiary, or any successors to such organization.   However, notwithstanding anything in the foregoing to the contrary, the Board shall have complete and absolute discretion to determine whether an Employee or Key Person is in the Continuous Service of the Company, a Parent, or Subsidiary at any time.

2.13    **Controlled Group** means the Company and any other entity the employees of which would be required to be aggregated with the employees of the Company pursuant to Code §§414(b), (c), (m) or (o).

2.14    **Customer** means any Person to whom the Company, or any Parent or Subsidiary thereof, has sold its products or services.

2.15    **Deferred Unit** means a contractual right granted to a Participant under this Plan to receive a Unit that is subject to restrictions of this Plan and the applicable Unit Incentive Agreement.

2.16    **Effective Date** means the "Effective Date" as set forth in Section 4 of this Plan.

2.17    **Eligible Recipient** means an Employee and/or a Key Person.

Charter Up Holdings, LLC 2019 Unit Incentive Plan<br>Page 2

**2.18**    *Employee* means a common law employee of the Company, a Subsidiary or a Parent.

**2.19**    *ERISA* means the Employee Retirement Income Security Act of 1974, as amended.

**2.20**    *Exchange Act* means the Securities Exchange Act of 1934, as amended.

**2.21**    *Exercise Price* means the price that shall be paid to purchase one (1) Unit upon the exercise of an Option granted under this Plan.

**2.22**    *Fair Market Value* of each Unit on any given date means the price determined below as of the close of business on such date (*provided, however*, if for any reason, the Fair Market Value per Unit cannot be ascertained or is unavailable for such date, the Fair Market Value per Unit shall be determined as of the nearest preceding date on which such Fair Market Value can be ascertained):

(a)    If the Unit is listed or traded on any established stock exchange or a national market system, including without limitation the National Market of the National Association of Securities Dealers, Inc. Automated Quotation ("*NASDAQ*") System, its Fair Market Value shall be the closing sale price for the Unit (or the mean of the closing bid and ask prices, if no sales were reported), on such exchange or system on the date of such determination or, if the stock exchange or national market on which the Units trade is not open on the date of determination, the last business day prior to the date of determination, as reported in The Wall Street Journal or such other source as the Board deems reliable; or

(b)    If the Unit is not listed or traded on any established stock exchange or a national market system, its Fair Market Value shall be the average of the closing dealer "bid" and "ask" prices of a Unit as reflected on the NASDAQ interdealer quotation system of the National Association of Securities Dealers, Inc. on the date of such determination; or

(c)    In the absence of an established public trading market for the Unit, the Fair Market Value of a Unit shall be determined in good faith by the Board.

**2.23**    *FLSA Exclusion* means the provisions of Section 7(e) of the Fair Labor Standards Act of 1938, as amended (the "*FLSA*") that exempt certain Unit-based compensation from inclusion in overtime determinations under the FLSA. *The provisions of Section 7(e) of the FLSA may not apply to Limited Liability Company Units; therefore no FLSA Exclusion may be available with respect to awards under this Plan.*

**2.24**    *Forfeiture Activities* means, with respect to a Participant, any of the following:

(a)    *Trade Secrets & Confidential Information.* Such Participant (i) uses, discloses, or reverse engineers the Trade Secrets or the Confidential Information for any purpose other than the Company's Business, or the Business of a Parent or Subsidiary thereof, except as authorized in writing by the Company, or any Parent or Subsidiary thereof; (ii) during the Participant's employment with the Company, or any Parent or Subsidiary thereof, uses, discloses, or reverse engineers (a) any confidential information or trade secrets of any former employer or third party, or (b) any works of authorship developed in whole or in part by the Participant during any former employment or for any other party, unless authorized in writing by the former employer or third party; or (iii) after the Participant's cessation of services for the Company, or any Parent or Subsidiary thereof, (a) retains any Trade Secrets or Confidential Information, including any copies existing in any form (including electronic form), which are in Participant's possession or control, or (b) destroys, deletes, or alters any Trade Secrets or Confidential Information without the Company's (or a Parent's or Subsidiary's) prior written consent. The Forfeiture Activities under this subsection (a) shall: (i) with regard to the Trade Secrets, remain in effect and be applicable as long as the information constitutes a Trade Secret under applicable law, and (ii) with regard to the Confidential Information, remain in effect and be applicable during the Forfeiture Period.

(b)    *Solicitation of Customers.* During the Forfeiture Period of such Participant, the Participant directly or indirectly, solicits any Customer for the purpose of selling or providing any products or services competitive with the Business, provided that such Participant had Contact with such Customer at any time during the period in which the Participant was employed by or performed services for the Company, and any Parent or Subsidiary thereof. Nothing in this subsection (b) shall be construed to include any Customer of the Company, or any Parent or Subsidiary thereof, (i) to which such Participant never sold or provided any products or services while employed by or providing services to the Company, or any Parent or Subsidiary thereof, (ii) that explicitly severed its business relationship with the Company, or any Parent or Subsidiary thereof, unless such Participant, directly or indirectly, caused or encouraged the Customer to

sever the relationship, or (iii) to which Participant is selling or providing products or services the Company, or any Parent or Subsidiary thereof, no longer offers.

    **(c)**    *Solicitation of Prospective Customers.* During the Forfeiture Period of such Participant, the Participant, directly or indirectly, solicits any Prospective Customer of the Company, or any Parent or Subsidiary thereof, for the purpose of selling or providing any products or services competitive with the Business, provided that such Participant had Contact with such Prospective Customer during the last year of the period in which Participant was employed by or performed services for the Company, and any Parent or Subsidiary thereof (or during such period if employed or providing services for less than a year). Nothing in this subsection (c) shall be construed to include Prospective Customers of the Company, or any Parent or Subsidiary thereof, to which Participant is selling or providing any products or services which the Company, or any Parent or Subsidiary thereof, no longer offers.

    **(d)**    *Solicitation of Forfeiture Period Employees.* During the Forfeiture Period of such Participant, the Participant, directly or indirectly, solicits, recruits or induces any Forfeiture Period Employee to (a) terminate his employment or service relationship with the Company, or any Parent or Subsidiary thereof, or (b) work for any other Person engaged in the Business. This subsection (d) shall only apply to Forfeiture Period Employees (i) with whom such Participant had Material Interaction, or (ii) such Participant, directly or indirectly, supervised.

    **(e)**    *Non-Disparagement.* During the Forfeiture Period of such Participant, the Participant makes any disparaging or defamatory statements, whether written or oral, regarding the Company, or any Parent or Subsidiary thereof,. This shall not preclude the Participant from responding truthfully to questions or requests for information to the government, a regulator or in a court of law in connection with a legal or regulatory investigation or proceeding.

    **2.25**    *Forfeiture Period* means, with respect to a Participant, the time period during which such Participant is employed with, or is performing services for, the Company, or any Parent or Subsidiary thereof, and for a period of two (2) years thereafter.

    **2.26**    *Forfeiture Period Employee* means any Person who (a) is employed by or providing services to the Company, or any Parent or Subsidiary thereof, at the time Participant ceases to perform services for the Company, or any Parent or Subsidiary thereof, or (b) was employed by or providing services to the Company, or any Parent or Subsidiary thereof, during the last year in which Participant performed services for the Company, and any Parent or Subsidiary thereof (or during the period in which the Participant performed services for the Company, or any Parent or Subsidiary thereof, if the Participant performed services for the Company, or any Parent or Subsidiary thereof, for less than a year).

    **2.27**    *Good Reason* shall exist if (i) the Company, or any Parent or Subsidiary thereof,, without the consent of a Participant who is performing services for the Company, or any Parent or Subsidiary thereof, materially (a) diminishes such Participant's base compensation, (b) diminishes such Participant's authority, duties or responsibilities, (c) changes the geographic location at which such Participant must perform the services, or (d) breaches, whether by action or inaction, the agreement under which such Participant provides services; (ii) such Participant provides written notice to the Company, or any Parent or Subsidiary thereof, of the existence of such condition described in subsection (i) of this paragraph within thirty (30) days of the initial existence of such condition and provides the Company, or any Parent or Subsidiary thereof, with thirty (30) days to remedy such condition (the "*Cure Period*"); (iii) the Company, or any Parent or Subsidiary thereof, fails to remedy such condition within the Cure Period; and (iv) Participant elects to resign within thirty (30) days of the expiration of the Cure Period.

    **2.28**    *Initial Public Offering* means the closing of the Company's initial public offering of any class or series of the Company's equity securities pursuant to an effective registration statement filed by the Company under the Securities Act.

    **2.29**    *Insider* means an individual who is, on the relevant date, an officer, member of the Board or ten percent (10%) beneficial owner of any class of the Company's equity securities that is registered pursuant to Section 12 of the Exchange Act, all as defined under Section 16 of the Exchange Act.

    **2.30**    *Key Person* means (a) a member of the Board who is not an Employee, or (b) a consultant or advisor; *provided, however*, that such consultant or advisor must be an individual who is providing or will be providing *bona fide* services to the Company, a Subsidiary or a Parent, with such services (i) not being in connection with the offer or sale of securities in a capital-raising transaction, and (ii) not directly or indirectly

promoting or maintaining a market for securities of the Company, a Subsidiary or a Parent, within the meaning of 17 CFR §230.701(c)(1).

**2.31    Material Interaction** means, with respect to a Participant, any interaction between such Participant and a Forfeiture Period Employee that relates or related, directly or indirectly, to the performance of such Participant's duties or the Forfeiture Period Employee's duties for the Company, and any Parent or Subsidiary thereof.

**2.32    NQO** means an option granted under this Plan to purchase Units that is not intended by the Company to satisfy the requirements of Code §422.

**2.33    Operating Agreement** means the Limited Liability Company Agreement of Charter Up Holdings, LLC dated as of January 30, 2019.

**2.34    Option** means a right to purchase Units pursuant to the terms of the Plan at a stated price for a specified period of time.  For purposes of the Plan, an Option will be a NQO.

**2.35    Outside Board Member** means a member of the Board of Managers who is not an Employee and who qualifies as a "non-employee director" under Rule 16b-3(b)(3) under the Exchange Act, as amended from time to time.

**2.36    Parent** means any entity (other than the entity employing a Participant or for which a Participant is performing services) in an unbroken chain of entities ending with the entity employing a Participant or for which a Participant is performing services if, at the time of the granting of the Unit Incentive, each of the entities other than the entity employing the Participant or for which a Participant is performing services owns Unit possessing fifty percent (50%) or more of the total combined voting power of all classes of Unit in one of the other entities in such chain.  However, for purposes of interpreting any Unit Incentive Agreement issued under this Plan as of a date of determination, Parent shall mean any entity (other than the entity employing a Participant or for which a Participant is performing services) in an unbroken chain of entities ending with the entity employing a Participant or for which a Participant is performing services if, at the time of the granting of the Unit Incentive and thereafter through such date of determination, each of the entities other than the entity employing the Participant or for which a Participant is performing services owns Unit possessing fifty percent (50%) or more of the total combined voting power of all classes of Unit in one of the other entity in such chain.

**2.37    Participant** means an individual who receives a Unit Incentive hereunder.

**2.38    Person** means an individual or entity.

**2.39    Plan** means the Charter Up Holdings, LLC 2019 Unit Incentive Plan, as may be amended from time to time.

**2.40    Prospective Customer** means any Person to which the Company, or any Parent or Subsidiary thereof, has solicited to sell its products or services.

**2.41    Restricted Unit Award** means an award of Units granted to a Participant under this Plan whereby the Participant has immediate rights of ownership in the Units underlying the award, but such Units are subject to restrictions in accordance with the terms and provisions of this Plan and the Unit Incentive Agreement pertaining to the award and may be subject to forfeiture by the Participant until the earlier of (a) the time such restrictions lapse or are satisfied, or (b) the time such units are forfeited, pursuant to the terms and provisions of the Unit Incentive Agreement pertaining to the award.

**2.42    Securities Act** means the Securities Act of 1933, as amended.

**2.43    Separation from Service** means a "separation from service" within the meaning of Treas. Reg. §1.409A-1(h) (without giving effect to any elective provisions that may be available under such provisions).

**2.44    Specified Employee** means a "specified employee" as defined in Treas. Reg. §1.409A-1(i) using the identification methodology selected by the Company from time to time.

**2.45    UAR Exercise Price**  means the amount per Unit specified in an a Unit Incentive Agreement with respect to a Unit Appreciation Right, which, when subtracted from the Fair Market Value of a Unit on exercise of such Unit Appreciation Right, determines the payment that the holder of such Unit Appreciation Right may be entitled to receive.

**2.46    Unit** means a Unit of the Company.

Charter Up Holdings, LLC 2019 Unit Incentive Plan
Page 5

**2.47    *Unit Appreciation Right*** means a right granted to a Participant pursuant to the terms and provisions of this Plan whereby the Participant, without payment to the Company (except for any applicable withholding or other taxes), receives cash, Units, a combination thereof, or such other consideration as the Board may determine, in an amount equal to the excess of the Fair Market Value per Unit on the date on which the Unit Appreciation Right is exercised over the UAR Exercise Price noted in the Unit Appreciation Right for each Unit subject to the Unit Appreciation Right.

**2.48    *Unit Incentive*** means a NQO, a Restricted Unit Award, a Deferred Unit, or a Unit Appreciation Right.

**2.49    *Unit Incentive Agreement*** means an agreement between the Company and a Participant evidencing an award of a Unit Incentive.

**2.50    *Subsidiary*** means any entity (other than the entity employing such Participant or for which such Participant is performing services) in an unbroken chain of entities beginning with the entity employing such Participant if, at the time of the granting of the Unit Incentive, each of the entities other than the last entity in the unbroken chain owns Unit possessing fifty percent (50%) or more of the total combined voting power of all classes of Unit in one of the other entities in such chain.  However, for purposes of interpreting any Unit Incentive Agreement issued under this Plan as of a date of determination, Subsidiary shall mean any entity (other than the entity employing such Participant or for which such Participant is performing services) in an unbroken chain of entities beginning with the entity employing such Participant if, at the time of the granting of the Unit Incentive and thereafter through such date of determination, each of the entities other than the last entity in the unbroken chain owns Unit possessing fifty percent (50%) or more of the total combined voting power of all classes of Unit in one of the other entities in such chain.

**2.51    *Trade Secrets*** means information of the Company, or any Parent or Subsidiary thereof, and its licensors, suppliers, clients and customers, without regard to form, including, but not limited to, technical or non-technical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product plans, a list of actual Customers, clients, licensors, or suppliers, or a list of Prospective Customers, clients, licensors, or suppliers which is not commonly known by or available to the public and which information (i) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other Persons who can obtain economic value from its disclosure or use, and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

## 3    UNITS SUBJECT TO UNIT INCENTIVES

**3.1    *Maximum Aggregate Units Issuable Pursuant to Unit Incentives.*** The total number of Units that may be issued pursuant to Unit Incentives under this Plan shall not exceed 11,226, as adjusted pursuant to Section 10.  Such Units shall be reserved, to the extent that the Company deems appropriate, from authorized but unissued Units, from Units that have been reacquired by the Company, from Units paid to the Company pursuant to the exercise of Unit Incentives issued under the Plan, or from Units withheld by the Company for payment of taxes.

**3.2    *Determination of Maximum Aggregate Units Issuable.*** Any Units subject to a Unit Incentive that remain un-issued after the cancellation, expiration, lapse or exchange of such Unit Incentive thereafter shall again become available for use under this Plan.  Only the net number of Units that are issued pursuant to the exercise of an Option shall be counted as issued in applying the provisions of Section 3.1 above in the case of an Option which is exercised through a "cashless" or "net share" exercise as described in Section 7.2(e).

## 4    EFFECTIVE DATE

The Effective Date of this Plan shall be the date it is adopted by the Board, or such delayed effective date as the Board may specify, as noted in resolutions effectuating such adoption.  No Unit Incentives shall be granted under this Plan before the date of such approval.

## 5    ADMINISTRATION

**5.1    *General Administration.*** This Plan shall be administered by the Board.  The Board, acting in its complete and absolute discretion, shall exercise all such powers and take all such action as it deems necessary or desirable to carry out the purposes of this Plan.  The Board shall have the power to interpret this Plan and, subject to the terms and provisions of this Plan, to take such other action in the administration and operation of the Plan as it deems equitable under the circumstances. The Board's actions shall be binding on the Company,

or any Parent or Subsidiary thereof, on each affected Eligible Recipient, and on each other Person directly or indirectly affected by such actions.

**5.2**    *Authority of the Board.*    Except as limited by law or by the Operating Agreement of the Company, and subject to the provisions herein, the Board shall have full power to select Eligible Recipients who shall participate in the Plan, to determine the sizes and types of Unit Incentives in a manner consistent with the Plan, to determine the terms and conditions of Unit Incentives in a manner consistent with the Plan, to construe and interpret the Plan and any agreement or instrument entered into under the Plan, to establish, amend or waive rules and regulations for the Plan's administration, and to amend the terms and conditions of any outstanding Unit Incentives as allowed under the Plan and such Unit Incentives.   Further, the Board may make all other determinations that may be necessary or advisable for the administration of the Plan.

**5.3**    *Delegation of Authority.*    The Board may delegate its authority under the Plan, in whole or in part, to a Committee appointed by the Board consisting of not less than one (1) member of the Board or to one or more other Persons to whom the powers of the Board hereunder may be delegated in accordance with applicable law.   The members of the Committee and any other Persons to whom authority has been delegated shall be appointed from time to time by, and shall serve at the discretion of, the Board.   The Committee or other delegate (if appointed) shall act according to the policies and procedures set forth in the Plan and to those policies and procedures established by the Board, and the Committee or other delegate shall have such powers and responsibilities as are set forth by the Board.   Reference to the Board in this Plan shall specifically include reference to the Committee or other delegate where the Board has delegated its authority to the Committee or other delegate, and any action by the Committee or other delegate pursuant to a delegation of authority by the Board shall be deemed an action by the Board under the Plan.   Notwithstanding the above, the Board may assume the powers and responsibilities granted to the Committee or other delegate at any time, in whole or in part.   With respect to Committee appointments and composition, only a Committee (or a subcommittee thereof) comprised solely of Outside Board Members may grant Unit Incentives to Insiders that will be exempt from Section 16(b) of the Exchange Act.

**5.4**    *Decisions Binding.*    All determinations and decisions made by the Board (or its delegate) pursuant to the provisions of this Plan and all related orders and resolutions of the Board shall be final, conclusive and binding on all Persons, including the Company, or any Parent or Subsidiary thereof, its Unit holders, members of the Board, Eligible Recipients, Participants, and their estates and beneficiaries.

**5.5**    *Indemnification for Decisions.*    Neither the Board nor the Committee (or a subcommittee thereof) shall be liable in connection with or by reason of any act or omission performed or omitted to be performed on behalf of the Company in such capacity, *provided*, that the Board has determined, in good faith, that the course of conduct that caused the loss or liability was in the best interests of the Company.   Service on the Committee (or a subcommittee thereof) shall constitute service as a Manager of the Company, so that the members of the Committee (or a subcommittee thereof) shall be entitled to indemnification and reimbursement as members of the Board of the Company pursuant to its Operating Agreement and applicable law.   In addition, the Board, or the Committee (or a subcommittee thereof) shall be indemnified by the Company against the following losses or liabilities reasonably incurred in connection with or by reason of any act or omission performed or omitted to be performed on behalf of the Company in such capacity; *provided, however*, that the Board has determined, in good faith, that the course of conduct that caused the loss or liability was in the best interests of the Company: (a) the reasonable expenses, including attorneys' fees actually and necessarily incurred in connection with the defense of any action, suit or proceeding, to which they or any of them may be a party by reason of any action taken or failure to act under or in connection with the Plan, any Unit Incentive granted hereunder, and (b) against all amounts paid by them in settlement thereof (provided such settlement is approved by independent legal counsel selected by the Company) or paid by them in satisfaction of a judgment in any such action, suit or proceeding, except in relation to matters as to which it shall be adjudged in such action, suit or proceeding that such individual is liable for gross negligence or misconduct in the performance of his duties, *provided* that within 60 days after institution of any such action, suit or proceeding a Committee member or delegatee shall in writing offer the Company the opportunity, at its own expense, to handle and defend the same.   The Company shall not indemnify or hold harmless the member of the Board or the Committee (or a subcommittee thereof) if the loss or liability was the result of gross negligence or willful misconduct by the member of the Board or would not be allowed under applicable law.   Any indemnification of expenses or agreement to hold harmless may be paid only out of the net assets of the Company, and no portion may be recoverable from the Unit holders of the Company.

**5.6**     *Majority Rule.*  A majority of the members of the Board (or its delegate) shall constitute a quorum, and any action taken by a majority at a meeting at which a quorum is present, or any action taken without a meeting evidenced by a writing executed by all the members of the Board (or its delegate), shall constitute action of the Board.

## 6     ELIGIBILITY

Eligible Recipients selected by the Board shall be eligible for the grant of Unit Incentives under this Plan, but no Eligible Recipient shall have the right to be granted a Unit Incentive under this Plan merely as a result of his or her status as an Eligible Recipient.

## 7     TERMS OF UNIT INCENTIVES

### 7.1     Terms & Conditions of All Unit Incentives.

(a)     *Grants of Unit Incentives.*  The Board, in its complete and absolute discretion, shall grant Unit Incentives under this Plan from time to time and, to the extent allowed by Sections 7.2(i) and 7.3(g) herein, shall have the right to grant new Unit Incentives in exchange for outstanding Unit Incentives, including, but not limited to, exchanges of NQOs for the purpose of achieving a lower Exercise Price.  Unit Incentives shall be granted to Eligible Recipients selected by the Board, and the Board shall be under no obligation whatsoever to grant any Unit Incentives, or to grant Unit Incentives to all Eligible Recipients, or to grant all Unit Incentives subject to the same terms and conditions.

(b)     *Units Subject to Unit Incentives.*  The number of Units as to which a Unit Incentive shall be granted shall be determined by the Board in its complete and absolute discretion, subject to the provisions of Section 3 as to the total number of Units available for grants under the Plan.

(c)     *Unit Incentive Agreements.*  Each Unit Incentive shall be evidenced by a Unit Incentive Agreement executed by the Company, a Parent or a Subsidiary, and the Participant, which shall be in such form and contain such terms and conditions as the Board in its complete and absolute discretion may, subject to the provisions of the Plan, from time to time determine.

(d)     *Date of Grant.*  The date a Unit Incentive is granted shall be the date on which the Board (1) has approved the terms and conditions of the Unit Incentive Agreement, (2) has determined the recipient of the Unit Incentive and the number of Units covered by the Unit Incentive, (3) has taken all such other action necessary to direct the grant of the Unit Incentive, and (4) if applicable, any conditions imposed on such grant by the Board have been fulfilled.

### 7.2     Terms & Conditions of Options.

(a)     *Necessity of Unit Incentive Agreements.*  Each grant of an Option shall be evidenced by a Unit Incentive Agreement that shall specify that the Option is a NQO, and incorporate such other terms and conditions as the Board, acting in its complete and absolute discretion, deems consistent with the terms of this Plan, including (without limitation) a restriction on the number of Units subject to the Option that first become exercisable during any calendar year.  The Board and/or the Company shall have complete and absolute discretion to modify the terms and provisions of an Option in accordance with Section 12 of this Plan.

(b)     *Determining Optionees.*  In determining Eligible Recipient(s) to whom an Option shall be granted and the number of Units to be covered by such Option, the Board may take into account the recommendations of the Chief Executive Officer of the Company, or any Parent or Subsidiary thereof, and its other officers, the duties of the Eligible Recipient, the present and potential contributions of the Eligible Recipient to the success of the Company, or any Parent or Subsidiary thereof,, and other factors deemed relevant by the Board, in its complete and absolute discretion, in connection with accomplishing the purpose of this Plan.  An Eligible Recipient who has been granted an Option to purchase Units, whether under this Plan or otherwise, may be granted one or more additional Options.

(c)     *Exercise Price.*  Subject to adjustment in accordance with Section 10 and the other provisions of this Section, the Exercise Price shall be as set forth in the applicable Unit Incentive Agreement.  The Exercise Price of each Unit shall be no less than (1) the minimum price required by applicable state law, or (2) the minimum price required by the Company's Operating Agreement, whichever price is greatest.  Any Option intended to meet the FLSA Exclusion must be granted with an Exercise Price equivalent to or greater than eighty-five percent (85%) of the Fair Market Value of a Unit on the date granted determined as

of the date of such grant. Any Option that is not intended to be "deferred compensation" subject to Code §409A must be granted with an Exercise Price equivalent to or greater than the Fair Market Value of a Unit determined as of the date of such grant, consistent with Treas. Reg. §1.409A-1(b)(5)(iv), and any other applicable guidance or regulations issued by the Internal Revenue Service. Notwithstanding the foregoing, the Exercise Price of an Option granted in substitution of an existing option pursuant to Treas. Reg. §1.424-1(a) or Treas. Reg. §1.409A-1(b)(5)(v)(D) may be established under the requirements of those provisions without regard to the foregoing (see subsection (h) below).

(d)    *Option Term*. Each Option granted under this Plan shall be exercisable in whole or in part at such time or times as set forth in the related Unit Incentive Agreement, but no Unit Incentive Agreement shall:

(1)    make an Option exercisable before the date such Option is granted; or

(2)    make an Option exercisable after the earlier of:

(i)    the date such Option is exercised in full, or

(ii)    the date that is the tenth (10th) anniversary of the date such Option is granted.

A Unit Incentive Agreement may provide for the exercise of an Option after the employment or service of a Participant has terminated for any reason whatsoever, including death or disability. The Participant's rights, if any, upon termination of employment or service will be set forth in the applicable Unit Incentive Agreement. The exercise period of an Option shall be tolled during any period that the Option cannot be exercised because such an exercise would violate an applicable Federal, state, local or foreign law, or would jeopardize the ability of the Company to continue as a going concern; *provided, however*, the period during which the Option may otherwise be exercised shall be extended only thirty (30) days after the exercise of the Option first would no longer violate such applicable Federal, state, local or foreign laws or first would no longer jeopardize the ability of the Company to continue as a going concern.

(e)    *Payment*. Options shall be exercised by the delivery of a written notice of exercise to the Company, setting forth the number of Units with respect to which the Option is to be exercised accompanied by full payment for the Units. Payment for Units purchased pursuant to exercise of an Option shall be made in cash or, unless the Unit Incentive Agreement provides otherwise and subject to the discretion of the Committee, by delivery to the Company of a number of Units having an aggregate Fair Market Value equal to the amount to be tendered (including a "cashless" or "net share" exercise), or a combination thereof. In a "net share" exercise, the Company will reduce the number of Units issued upon exercise by the largest whole number of Units with a Fair Market Value that does not exceed the aggregate Exercise Price; *provided, however*, that the Company shall accept cash or other payment from the Optionee to the extent of any remaining balance of the aggregate exercise price not satisfied by such reduction in the number of whole Units to be issued; and *provided further*, that Units will no longer be outstanding under an Option and will not be exercisable thereafter to the extent that (A) Units are used to pay the Exercise Price pursuant to the "net share" exercise, (B) Units are delivered to the Optionee as a result of such exercise, and (C) Units are withheld to satisfy tax withholding obligations. In addition, unless the Unit Incentive Agreement provides otherwise, the Option may be exercised through a brokerage transaction following registration of the Company's equity securities under Section 12 of the Exchange Act as permitted under the provisions of Regulation T applicable to cashless exercises promulgated by the Federal Reserve Board, unless prohibited by Section 402 of the Sarbanes-Oxley Act of 2002. However, notwithstanding the foregoing, with respect to any Participant who is an Insider, a tender of units or a "cashless" or "net share" exercise must (1) have met the requirements of an exemption under Rule 16b-3 promulgated under the Exchange Act, or (2) be a subsequent transaction the terms of which were provided for in a transaction initially meeting the requirements of an exemption under Rule 16b-3 promulgated under the Exchange Act. Unless the Unit Incentive Agreement provides otherwise, the foregoing exercise payment methods shall be subsequent transactions approved by the original grant of an Option. Except as provided in subparagraph (f) below, payment shall be made at the time that the Option or any part thereof is exercised, and no Units shall be issued or delivered upon exercise of an Option until full payment has been made by the Participant. The holder of an Option, as such, shall have none of the rights of a Unit holder. Notwithstanding the above and unless prohibited by the Sarbanes-Oxley Act of 2002, in the complete and absolute discretion of the Board, an Option may be exercised as to a portion or all (as determined by the Board) of the number of Units specified in the Unit Incentive Agreement by delivery to the Company of a promissory note, such promissory note to be executed by the Participant and that shall include, with such

other terms and conditions as the Board shall determine, provisions in a form approved by the Board under which: (i) the balance of the aggregate purchase price shall be payable in equal installments over such period and shall bear interest at such rate (that shall not be less than the prime bank loan rate as determined by the Board, that shall be established at the time of exercise, and that must be a market rate based on the rate environment at the date of exercise, taking into account the provisions of Code §7872) as the Board shall approve, and (ii) the Participant shall be personally liable for payment of the unpaid principal balance and all accrued but unpaid interest. Other methods of payment may also be used if approved by the Board in its complete and absolute discretion and provided for under the Unit Incentive Agreement.

(f)    *Conditions to Exercise of an Option.*  Each Option granted under the Plan shall vest and shall be exercisable at such time or times, or upon the occurrence of such event or events, and in such amounts, as the Board shall specify in the Unit Incentive Agreement; *provided, however,* that subsequent to the grant of an Option, the Board, at any time before complete termination of such Option, may accelerate the time or times at which such Option may vest or be exercised in whole or in part. Notwithstanding the foregoing, an Option intended to meet the FLSA Exclusion shall not be exercisable for at least six (6) months following the date it is granted, except by reason of death, disability, retirement, a change in Company ownership or other circumstances permitted under regulations promulgated under the FLSA Exclusion. Furthermore, if a Participant holding an Option receives a hardship distribution from a Code §401(k) plan of the Company, or any Parent or Subsidiary, the Option may not be exercised during the six (6) month period following the hardship distribution, unless the Company, or any Parent or Subsidiary thereof, determines that such exercise would not jeopardize the tax-qualification of the Code §401(k) plan. The Board may impose such restrictions on any Units acquired pursuant to the exercise of an Option as it may deem advisable, including, without limitation, vesting or performance-based restrictions, voting restrictions, investment intent restrictions, restrictions on transfer, rights of the Company to re-purchase Units acquired pursuant to the exercise of an Option, "first refusal" rights of the Company to purchase Units acquired pursuant to the exercise of an Option prior to their sale to any other Person, "drag along" rights requiring the sale of units to a third party purchaser in certain circumstances, "lock up" type restrictions in the case of an Initial Public Offering of the Company's Unit, rights of the Company to re-purchase Units acquired pursuant to the exercise of an Option, restrictions or limitations or other provisions that would be applied to Unit holders under any applicable agreement among the Unit holders, a requirement that an Optionee agree to be bound by the terms and provisions of the Company's Operating Agreement, and restrictions under applicable federal securities laws, under the requirements of any Unit exchange or market upon which such Units are then listed and/or traded, and/or under any blue sky or state securities laws applicable to such Units. The Board shall also require, as a condition for the acquisition of any Units by a Participant or other Option holder pursuant to the exercise of an Option, that the Participant or Option holder execute an agreement by which the Participant or Option holder agrees to be bound by, and subject to, any agreement(s) among the Company's Unit holders then in effect.

(g)    *Transferability of Options.*  An Option shall not be transferable or assignable except by will or by the laws of descent and distribution and shall be exercisable, during the Participant's lifetime, only by the Participant; *provided, however,* that in the event the Participant is incapacitated and unable to exercise his or her Option, such Option may be exercised by such Participant's legal guardian, legal representative, or other representative whom the Board deems appropriate based on applicable facts and circumstances. The determination of incapacity of a Participant and the determination of the appropriate representative of the Participant who shall be able to exercise the Option if the Participant is incapacitated shall be determined by the Board in its complete and absolute discretion. Notwithstanding the foregoing, except as otherwise provided in the Unit Incentive Agreement, a NQO may also be transferred by a Participant as a bona fide gift or through a domestic relations order to any "family member" (as that term is defined in 17 CFR §230.701(c)(3)) of the Participant, and in each case the transferee shall be subject to all provisions of the Plan, the Unit Incentive Agreement and other agreements with the Participant in connection with the exercise of the Option and purchase of Units. In the event of such a gift or transfer by domestic relations order, the Participant shall promptly notify the Board of such transfer and deliver to the Board such written documentation as the Board may in its complete and absolute discretion request, including, without limitation, the written acknowledgment of the donee that the donee is subject to the provisions of the Plan, the Unit Incentive Agreement and other agreements with the Participant. Notwithstanding the foregoing, a Unit Incentive Agreement may provide for more limited transferability than is described above.

(h)    *Special Provisions for Certain Substitute Options.*  Notwithstanding anything to the contrary in this Section, any Option granted in substitution for a Unit option previously issued by another entity, which

substitution occurs in connection with a transaction to which Code §424(a) is applicable or to which Code §424(a) would be applicable if the entity were an eligible corporation, may provide for an exercise price computed in accordance with Code §424(a) and the regulations thereunder or under Treas. Reg. §1.409A-1(b)(5)(v)(D) and may contain such other terms and conditions as the Board may prescribe to cause such substitute Option to contain as nearly as possible the same terms and conditions (including the applicable vesting and termination provisions) as those contained in the previously issued Unit option being replaced thereby.

(i)    *Potential Repricing of Unit Options.*  With respect to any one or more Options granted pursuant to, and under, this Plan, the Board may determine that the repricing of all or any portion of such existing outstanding Options is appropriate without the need for any additional approval of the Unit holders of the Company.  For this purpose, "repricing" of Options shall include, but not be limited to, any of the following actions (or any similar action): (1) lowering the Exercise Price of an existing Option; (2) any action which would be treated as a "repricing" under generally accepted accounting principles; or (3) canceling of an existing Option at a time when its Exercise Price exceeds the Fair Market Value of the underlying Unit subject to such Option, in exchange for another Option, a Restricted Unit Award, or other equity in the Company.  The Board shall have the unilateral right, without the need for any consent or acquiescence by a Participant holding an Option, to reduce the Exercise Price of such Option so long as no other terms and conditions of such Option are modified and the Participant is notified in writing of the Exercise Price reduction.

**7.3    *Terms and Conditions of Unit Appreciation Rights.***

(a)    *Grants of Unit Appreciation Rights.*  A Unit Appreciation Right may be granted in connection with all or any portion of a previously or contemporaneously granted Option or not in connection with an Option.  A Unit Appreciation Right shall entitle the Participant to receive upon exercise or payment the excess of the Fair Market Value of a specified number of Units at the time of exercise, over a UAR Exercise Price that shall be not less than the UAR Exercise Price for that number of Units in the case of a Unit Appreciation Right granted in connection with a previously or contemporaneously granted Option, or not less than eighty-five percent (85%) of the Fair Market Value of that number of Units at the time the Unit Appreciation Right was granted in the case of any other Unit Appreciation Right; *provided, however,* any Unit Appreciation Right that is not intended to provide deferred compensation subject to Code §409A must be granted with a UAR Exercise Price equivalent to or greater than the Fair Market Value of a Unit determined as of the date of such grant, consistent with Treas. Reg. §1.409A-1(b)(5)(iv), and any other applicable guidance or regulations issued by the Internal Revenue Service.  The exercise of a Unit Appreciation Right shall result in a pro rata surrender of the related Option to the extent the Unit Appreciation Right has been exercised.

(b)    *Payment.*  Upon exercise or payment of a Unit Appreciation Right, the Company shall pay to the Participant the appreciation in cash or Units (at the aggregate Fair Market Value on the date of payment or exercise) as provided in the Unit Incentive Agreement or, in the absence of such provision, as the Board may determine.  To the extent that a Unit Appreciation Right is paid in cash, it shall nonetheless be deemed paid in Units for purposes of Section 3 hereof.

(c)    *Conditions to Exercise.*  Each Unit Appreciation Right granted under the Plan shall be exercisable at such time or times, or upon the occurrence of such event or events, and in such amounts, as the Board shall specify in the Unit Incentive Agreement; *provided, however,* that subsequent to the grant of a Unit Appreciation Right, the Board, at any time before complete termination of such Unit Appreciation Right, may accelerate the time or times at which such Unit Appreciation Right may be exercised in whole or in part.  Furthermore, if the Participant holding a Unit Appreciation Right receives a hardship distribution from a Code §401(k) plan of the Company, or any Parent or Subsidiary, the Unit Appreciation Right may not be exercised during the six (6) month period following the hardship distribution, unless the Company, or any Parent or Subsidiary thereof, determines that such exercise would not jeopardize the tax-qualification of the Code §401(k) plan.  The exercise period of a Unit Appreciation Right shall be tolled during any period that the Unit Appreciation Right cannot be exercised because such an exercise would violate an applicable Federal, state, local or foreign law, or would jeopardize the ability of the Company to continue as a going concern; *provided, however,* the period during which the Unit Appreciation Right may otherwise be exercised shall be extended only thirty (30) days after the exercise of the Unit Appreciation Right first would no longer violate such applicable Federal, state, local or foreign laws or first would no longer jeopardize the ability of the Company to continue as a going concern.

(d)    *Restrictions on Units Awarded.*  Units awarded pursuant to Unit Appreciation Rights shall be subject to such restrictions as determined by the Board for periods determined by the Board.  The Board may impose such restrictions on any Units acquired pursuant to a Unit Appreciation Right as it may deem advisable, including, without limitation, vesting or performance-based restrictions, voting restrictions, investment intent restrictions, restrictions on transfer, rights of the Company to re-purchase Units acquired pursuant to the Unit Appreciation Rights, "first refusal" rights of the Company to purchase Units acquired pursuant to the Unit Appreciation Rights prior to their sale to any other Person, "drag along" rights requiring the sale of Units to a third party purchaser in certain circumstances, "lock up" type restrictions in connection with public offerings of the Company's Units, restrictions or limitations or other provisions that would be applied to Unit holders under any applicable agreement among the Unit holders, a requirement that a Participant agree to be bound by the terms and provisions of the Company's Operating Agreement, and restrictions under applicable federal securities laws, under the requirements of any Unit exchange or market upon which such Units are then listed and/or traded, and/or under any blue sky or state securities laws applicable to such Units.  The Board shall also require, as a condition for the acquisition of any Units by a Participant pursuant to the exercise of a Unit Appreciation Right, that the Participant execute an agreement by which the Participant agrees to be bound by, and subject to, any agreement(s) among the Company's Unit holders then in effect.

(e)    *Transferability of Unit Appreciation Rights.*  No Unit Appreciation Right granted under the Plan may be sold, transferred, pledged, assigned or otherwise alienated or hypothecated, other than by will or by the laws of descent and distribution.  Further, except as otherwise provided in a Participant's Unit Incentive Agreement, all Unit Appreciation Rights granted to a Participant under the Plan shall be exercisable, during the Participant's lifetime, only by the Participant, except that in the event the Participant is incapacitated and unable to exercise his or her Unit Appreciation Right, such Unit Appreciation Right may be exercised by such Participant's legal guardian, legal representative, or other representative whom the Board deems appropriate based on applicable facts and circumstances.  The determination of incapacity of a Participant and the determination of the appropriate representative of the Participant shall be determined by the Board in its complete and absolute discretion.  Notwithstanding the foregoing, except as otherwise provided in the Unit Incentive Agreement, (A) a Unit Appreciation Right which is granted in connection with the grant of a NQO may be transferred, but only with the NQO, and (B) a Unit Appreciation Right that is not granted in connection with the grant of a NQO, may be transferred by the Participant as a bona fide gift or through a domestic relations order to any "family member" (as that term is defined in 17 CFR §230.701(c)(3)) of the Participant, and in each case the transferee shall be subject to all provisions of the Plan, the Unit Incentive Agreement and other agreements with the Participant in connection with the exercise of the Unit Appreciation Right.  In the event of such a gift or transfer by domestic relations order, the Participant shall promptly notify the Board of such transfer and deliver to the Board such written documentation as the Board may in its complete and absolute discretion request, including, without limitation, the written acknowledgment of the donee that the donee is subject to the provisions of the Plan, the Unit Incentive Agreement and other agreements with the Participant in connection with the exercise of the Unit Appreciation Right.  Notwithstanding the foregoing, a Unit Incentive Agreement may provide for more limited transferability than is described above.

(f)    *Special Provisions for Tandem UARs.*  A Unit Appreciation Right granted in connection with an Option may only be exercised to the extent that the related Option has not been exercised.

(g)    *Potential Repricing of UARs.*  With respect to any one or more Unit Appreciation Rights granted pursuant to, and under, this Plan, the Board may determine that the repricing of all or any portion of such existing outstanding Unit Appreciation Rights is appropriate without the need for any additional approval of the Unit holders of the Company.  For this purpose, "repricing" of Unit Appreciation Rights shall include, but not be limited to, any of the following actions (or any similar action): (1) lowering the UAR Exercise Price of an existing Unit Appreciation Right; (2) any action which would be treated as a "repricing" under generally accepted accounting principles; or (3) canceling of an existing Unit Appreciation Right at a time when its UAR Exercise Price exceeds the Fair Market Value of the underlying Unit subject to such Unit Appreciation Right, in exchange for another Unit Appreciation Right, a Restricted Unit Award, or other equity in the Company.  The Board shall have the unilateral right, without the need for any consent or acquiescence by a Participant holding a Unit Appreciation right, to reduce the UAR Exercise Price of such Unit Appreciation Right so long as no other terms and conditions of such Unit Appreciation Right are modified and the Participant is notified in writing of the UAR Exercise Price reduction.

Charter Up Holdings, LLC 2019 Unit Incentive Plan
Page 12

**7.4    Terms & Conditions of Restricted Unit Awards.**

(a)    *Grants of Restricted Unit Awards.* Units awarded pursuant to Restricted Unit Awards shall be subject to such restrictions (if any) as determined by the Board for periods determined by the Board. Restricted Unit Awards issued under the Plan may have restrictions that lapse based upon the service of a Participant, or based upon the attainment (as determined by the Board) of performance goals, or based upon any other criteria that the Board may determine appropriate. Units awarded pursuant to a Restricted Unit Award may be forfeited to the extent that a Participant fails to satisfy the applicable conditions or restrictions during the period of restriction. The Company may retain the certificates representing Units subject to a Restricted Unit Award in the Company's possession until such time as all conditions and/or restrictions applicable to such Units have been satisfied. The Board may require a cash payment from the Participant in exchange for the grant of a Restricted Unit Award or may grant a Restricted Unit Award without the requirement of a cash payment; *provided, however*, if the Participant holding a Restricted Unit Award receives a hardship distribution from a Code §401(k) plan of the Company, or any Parent or Subsidiary, the Participant may not pay any amount for such Restricted Unit Award during the six (6) month period following the hardship distribution, unless the Company, or any Parent or Subsidiary thereof, determines that such payment would not jeopardize the tax-qualification of the Code §401(k) plan.

(b)    *Acceleration of Award.* The Board shall have the power to permit, in its complete and absolute discretion, an acceleration of the expiration of the applicable restrictions or the applicable period of such restrictions with respect to any part or all of the Units awarded to a Participant as part of a Restricted Unit Award.

(c)    *Necessity of Unit Incentive Agreement.* Each grant of a Restricted Unit Award shall be evidenced by a Unit Incentive Agreement that shall specify the terms, conditions and restrictions regarding the Units awarded to a Participant, and shall incorporate such other terms and conditions as the Board, acting in its complete and absolute discretion, deems consistent with the terms of this Plan. The Board shall have complete and absolute discretion to modify the terms and provisions of Restricted Unit Awards in accordance with Section 12 of this Plan.

(d)    *Restrictions on Units Awarded.* Units awarded pursuant to Restricted Unit Awards shall be subject to such restrictions as determined by the Board for periods determined by the Board. The Board may impose such restrictions on any Units acquired pursuant to a Restricted Unit Award as it may deem advisable, including, without limitation, vesting or performance-based restrictions, voting restrictions, investment intent restrictions, restrictions on transfer, rights of the Company to re-purchase Units acquired pursuant to the Restricted Unit Award, "first refusal" rights of the Company to purchase Units acquired pursuant to the Restricted Unit Award prior to their sale to any other Person, "drag along" rights requiring the sale of Units to a third party purchaser in certain circumstances, "lock up" type restrictions in connection with public offerings of the Company's Unit, a requirement that a Participant agree to be bound by the terms and provisions of the Company's Operating Agreement, restrictions or limitations or other provisions that would be applied to Unit holders under any applicable agreement among the Unit holders, and restrictions under applicable federal securities laws, under the requirements of any Unit exchange or market upon which such Units are then listed and/or traded, and/or under any blue sky or state securities laws applicable to such Units. The Board shall also require, as a condition for the acquisition of any Units pursuant to a Restricted Unit Award held by a Participant, that the Participant execute an agreement by which the Participant agrees to be bound by, and subject to, any agreement(s) among the Company's Unit holders then in effect.

(e)    *Transferability of Restricted Unit Awards.* A Restricted Unit Award may not be transferred by the holder Participant, except, subject to applicable law and other applicable restrictions: (A) upon the death of the holder Participant, a Restricted Unit Award may be transferred by will or by the laws of descent and distribution, (B) a Restricted Unit Award may, unless the applicable Unit Incentive Agreement provides otherwise, be transferred at any time as a bona fide gift or through a domestic relations order to any "family member" (as that term is defined in 17 CFR §230.701(c)(3)) of the Participant; *provided, however*, that the transferee must be bound by all terms and provisions of the underlying Restricted Unit Award, and (C) a Restricted Unit Award may be transferred at any time following the lapse of all restrictions on transferability of the Restricted Unit Award. Notwithstanding the foregoing, a Unit Incentive Agreement may provide for more limited transferability than is described above.

(f)      *Voting, Dividend & Other Rights.*  Unless the applicable Unit Incentive Agreement expressly provides otherwise, holders of Restricted Unit Awards shall, with respect to the Units subject to such Unit Incentive Agreement, be entitled to vote such Units during any period of restriction imposed by the Unit Incentive Agreement, but shall not be entitled to vote such Units on or after the date on which Units are forfeited pursuant to such Unit Incentive Agreement.

**7.5**      **Terms & Conditions of Deferred Units.**

(a)      *Grants of Deferred Units.*  A Deferred Unit shall entitle the Participant to receive one Unit at such future time and upon such terms as specified by the Board in the Unit Incentive Agreement evidencing such award.  Deferred Units issued under the Plan may have restrictions which lapse based upon the service of a Participant, or based upon other criteria that the Board may determine appropriate.  The Board may require a cash payment from the Participant in exchange for the grant of Deferred Units or may grant Deferred Units without the requirement of a cash payment; *provided, however,* if a Participant holding Deferred Units receives a hardship distribution from a Code §401(k) plan of the Company, or any Parent or Subsidiary, no payment for any Deferred Unit may be made by the Participant during the six (6) month period following the hardship distribution, unless the Company, or any Parent or Subsidiary thereof, determines that such payment would not jeopardize the tax-qualification of the Code §401(k) plan.  A Participant's right to Units based upon Deferred Units shall be an unfunded, unsecured obligation of the Company until such time as Units are actually issued to the Participant pursuant to the terms and provisions of the Unit Incentive Agreement evidencing such Deferred Units, and such Participant shall have no right to any specific assets of the Company prior thereto.

(b)      *Vesting of Deferred Units.*  The Board may establish a vesting schedule applicable to a Deferred Unit and may specify the times, vesting and performance goal requirements that may be applicable to a Deferred Unit.  Until the end of the period(s) of time specified in any such vesting schedule and/or the satisfaction of any such performance criteria, the Deferred Units subject to such Unit Incentive Agreement shall remain subject to forfeiture.

(c)      *Acceleration of Award.*  The Board shall have the power to permit, in its complete and absolute discretion, an acceleration of the applicable restrictions or the applicable period of such restrictions with respect to any part or all of the Deferred Units awarded to a Participant.

(d)      *Necessity of Unit Incentive Agreement.*  Each grant of Deferred Units shall be evidenced by a Unit Incentive Agreement that shall specify the terms, conditions and restrictions regarding the Participant's right to receive Units in the future, and shall incorporate such other terms and conditions as the Board, acting in its complete and absolute discretion, deems consistent with the terms of this Plan.  The Board shall have complete and absolute discretion to modify the terms and provisions of Deferred Units in accordance with Section 12 of this Plan.

(e)      *Transferability of Deferred Units.*  Except as otherwise provided in a Participant's Unit Incentive Agreement, no Deferred Unit granted under the Plan may be sold, transferred, pledged, assigned or otherwise alienated or hypothecated by the holder Participant, except upon the death of the holder Participant by will or by the laws of descent and distribution.  Notwithstanding the foregoing, a Unit Incentive Agreement may provide for more limited transferability than is described above.

(f)      *Voting, Dividend & Other Rights.*  Unless the applicable Unit Incentive Agreement provides otherwise, holders of Deferred Units shall not be entitled to vote or to receive dividends until they become owners of the Units pursuant to their Deferred Units.

(g)      *Code §409A Requirements.*  A Deferred Unit must meet certain restrictions contained in Code §409A if it is to avoid taxation under Code §409A as a "nonqualified deferred compensation plan."  Grants of Deferred Units under this Plan should be made with consideration of the impact of Code §409A with respect to such grant upon both the Company and the recipient of the Deferred Unit.

(h)      *No ERISA Employee Benefit Plan Created.*  Except to the extent that the Board expressly determines otherwise in resolutions, a Deferred Unit must contain terms and provisions designed to ensure that the Deferred Unit will not be considered an "employee benefit plan" as defined in ERISA §3(3).

(i)      *Restrictions on Units Awarded.*  Units awarded pursuant to Deferred Units shall be subject to such restrictions as determined by the Board for periods determined by the Board.  The Board may impose such restrictions on any Units acquired pursuant to a Deferred Unit as it may deem advisable, including,

without limitation, vesting or performance-based restrictions, voting restrictions, investment intent restrictions, restrictions on transfer, rights of the Company to re-purchase Units acquired pursuant to the Deferred Units, "first refusal" rights of the Company to purchase Units acquired pursuant to the Deferred Units prior to their sale to any other Person, "drag along" rights requiring the sale of Units to a third party purchaser in certain circumstances, "lock up" type restrictions in connection with public offerings of the Company's Units, restrictions or limitations or other provisions that would be applied to Unit holders under any applicable agreement among the Unit holders, a requirement that a Participant agree to be bound by the terms and provisions of the Company's Operating Agreement, and restrictions under applicable federal securities laws, under the requirements of any Unit exchange or market upon which such Units are then listed and/or traded, and/or under any blue sky or state securities laws applicable to such Units. The Board shall also require, as a condition for the grant of any Units to a Participant pursuant to Deferred Units, that the Participant execute an agreement by which the Participant agrees to be bound by, and subject to, any agreement(s) among the Company's Unit holders then in effect.

## 8    SECURITIES REGULATION

Each Unit Incentive Agreement may provide that, upon the receipt of Units as a result of the exercise of a Unit Incentive or otherwise, the Participant shall, if so requested by the Company, hold such Units for investment and not with a view of resale or distribution to the public and, if so requested by the Company, shall deliver to the Company a written statement satisfactory to the Company to that effect. Each Unit Incentive Agreement may also provide that, if so requested by the Company, the Participant shall make a written representation to the Company that he or she will not sell or offer to sell any of such Units unless a registration statement shall be in effect with respect to such Units under the Securities Act, and any applicable state securities law or, unless he or she shall have furnished to the Company an opinion, in form and substance satisfactory to the Company, of legal counsel acceptable to the Company, that such registration is not required. Certificates representing the Units transferred upon the exercise of a Unit Incentive granted under this Plan may at the complete and absolute discretion of the Company bear a legend to the effect that such Units have not been registered under the Securities Act or any applicable state securities law and that such Units may not be sold or offered for sale in the absence of an effective registration statement as to such Units under the Securities Act and any applicable state securities law or an opinion, in form and substance satisfactory to the Company, of legal counsel acceptable to the Company, that such registration is not required. The Company shall not be required to issue any Units under any Unit Incentive if the issuance of such Units would constitute a violation by the Participant, the Company or any other Person of any law or regulation of any governmental authority, including any federal or state securities laws or regulations. The Company may, but shall in no event be obligated to, register any securities covered hereby pursuant to the Securities Act. The Company shall not be obligated to take any affirmative action in order to cause the issuance of Units pursuant hereto or pursuant to a grant of a Unit Incentive to comply with any law or regulation of any governmental authority. As to any jurisdiction that expressly imposes the requirement that Units may not be issued pursuant to a Unit Incentive unless and until the Units covered by such grant are registered or are exempt from registration, the issuance of Units pursuant to such grant (under circumstances in which the laws of such jurisdiction apply) shall be deemed conditioned upon the effectiveness of such registration or the availability of such an exemption.

## 9    LIFE OF PLAN

No Unit Incentive shall be granted under this Plan on or after the earlier of:

**9.1**    the tenth (10th) anniversary of the Effective Date of this Plan, or

**9.2**    the date on which all of the Units available for issuance under Section 3 of this Plan have (as a result of the exercise of Options or Unit Appreciation Rights granted under this Plan, lapse of all restrictions under Restricted Unit Awards granted under this Plan, or vesting and payment of all Deferred Units granted under this Plan) been issued or no longer are available for use under this Plan.

After such date, this Plan shall continue in effect with respect to any then-outstanding Unit Incentives until (1) all then-outstanding Options and Unit Appreciation Rights have been exercised in full or are no longer exercisable, (2) all Restricted Unit Awards have vested or been forfeited, and (3) all Deferred Units have vested and been paid or been forfeited.

## 10    ADJUSTMENT

Notwithstanding anything in Section 12 to the contrary, the number of Units reserved under Section 3 of this Plan, the limit on the number of Units that may be granted during a calendar year to any Eligible Recipient under Section 3 of this Plan, the number and type of Units subject to Unit Incentives granted under this Plan, and the Exercise Price of any Options and the UAR Exercise Price of any Unit Appreciation Rights, may be adjusted by the Board in its complete and absolute discretion in an equitable manner to reflect any change in the capitalization of the Company, including, but not limited to, such changes as Unit dividends or Unit splits; *provided, however*, that the Board shall be required to make such adjustments if such change in the capitalization of the Company constitutes an "equity restructuring" as defined in FASB ASC §718-10-20. Furthermore, the Board shall have the right to, and may in its complete and absolute discretion, adjust (in a manner that satisfies the requirements of Code §424(a) and/or Treas. Reg. §1.409A-1(b)(5)(v)(D)) the number of Units reserved under Section 3, and the number of Units subject to Unit Incentives granted under this Plan, and the Exercise Price of any Options and the UAR Exercise Price of any Unit Appreciation Rights in the event of any corporate transaction described in Code §424(a) and/or Treas. Reg. §1.409A-1(b)(5)(v)(D) that provides for the substitution or assumption of such Unit Incentives; *provided, how*ever, that the Board shall be required to make such adjustments if such corporate transaction constitutes an "equity restructuring" as defined in FASB ASC §718-10-20. If any adjustment under this Section creates a fractional Unit or a right to acquire a fractional Unit, such fractional Unit shall be disregarded, and the number of Units reserved under this Plan and the number subject to any Unit Incentives granted under this Plan shall be the next lower number of Units, rounding all fractions downward. An adjustment made under this Section by the Board shall be conclusive and binding on all affected Persons and, further, shall not constitute an increase in the number of Units reserved under Section 3.

## 11    CHANGE OF CONTROL OF COMPANY

**11.1    *General Rule for Options.*** Except as otherwise provided in a Unit Incentive Agreement, if a Change of Control occurs, and if the agreements effectuating the Change of Control do not provide for the assumption or substitution of all Options granted under this Plan, with respect to any Option granted under this Plan that is not so assumed or substituted (a "***Non-Assumed Option***"), the Committee, in its complete and absolute discretion, may, with respect to any or all of such Non-Assumed Options (including the possibility of different treatment with respect to different Participants), take any or all of the following actions to be effective as of the date of the Change of Control (or as of any other date fixed by the Committee occurring within the twenty-five (25) day period ending on the date of the Change of Control, but only if such action remains contingent upon the effectuation of the Change of Control) (such date referred to as the "***Action Effective Date***"), notwithstanding any provision of Section 12.3 of this Plan:

(a)    Accelerate (in whole or in part) the vesting and/or exercisability of any such Non-Assumed Option on or before a specified Action Effective Date; and/or

(b)    Unilaterally cancel all or any portion of any such Non-Assumed Option to the extent that is not vested and/or has not become exercisable as of a specified Action Effective Date (regardless of whether such Non-Assumed Option has any intrinsic value); and/or

(c)    Unilaterally cancel all or any portion of any such Non-Assumed Option as of a specified Action Effective Date in exchange for:

(1)    whole and/or fractional Units (or for whole Units and cash in lieu of any fractional Unit) that, in the aggregate, are equal in value to the excess of the Fair Market Value of the Units that could be purchased subject to all or the portion of such Non-Assumed Option being cancelled determined as of the Action Effective Date (taking into account vesting and/or exercisability) minus the aggregate Exercise Price for such Units; and/or

(2)    cash or other property equal in value to the excess of the Fair Market Value of any Units (or fractional Units) that could be purchased subject to all or the portion of such Non-Assumed Option being cancelled determined as of the Action Effective Date (taking into account vesting and/or exercisability) minus the aggregate Exercise Price for such Units; and/or

(d)    Unilaterally cancel all or any portion of any such Non-Assumed Option as of a specified Action Effective Date in exchange for cash or other property equal in value to the excess of the Change of Control Value of any Units (or fractional Units) that could be purchased subject to all or the portion of such Non-

Assumed Option being cancelled determined as of the Action Effective Date (taking into account vesting and/or exercisability) minus the aggregate Exercise Price for such Units; and/or

(e)    Unilaterally cancel all or any portion of any such Non-Assumed Option after a specified Action Effective Date after providing the holder of such Option with (1) an opportunity to exercise all or the portion of such Non-Assumed Option being cancelled to the extent vested and/or exercisable (taking into account vesting and/or exercisability as of the date of the Change of Control) on or before such Action Effective Date, and (2) reasonable notice of such opportunity to exercise prior to such Action Effective Date; and/or

(f)    Unilaterally require the exercise of, and unilaterally cause the exercise of, all or a portion of any such Non-Assumed Option by a "cashless" or "net share" exercise (as described in Section 7.2(e) hereof) as of a specified Action Effective Date; and/or

(g)    Unilaterally cancel all or any portion of any such Non-Assumed Option as of a specified Action Effective Date and notify the holder of such Option of such action, but only if the Fair Market Value of the Units that could be purchased subject to all or the portion of such Non-Assumed Option being cancelled determined as of such Action Effective Date (taking into account vesting and/or exercisability) does not exceed the aggregate Exercise Price for such Units.

With respect to subsection (e) above, notwithstanding any provision of this Plan or any Unit Incentive Agreement to the contrary, unless prohibited by the Sarbanes-Oxley Act of 2002, the Committee may, in its complete and absolute discretion, allow the holder of any such Non-Assumed Option to exercise such Non-Assumed Option under the provisions of subsection (e) above with a promissory note which shall become due and payable as of, or shortly after, the date of the Change of Control on such terms and conditions as the Committee may determine, consistent with the requirements of Code §7872.  However, notwithstanding the foregoing, to the extent that the Participant holding a Non-Assumed Option is an Insider, payment of cash in lieu of whole or fractional Units or units of a successor may only be made to the extent that such payment (1) has met the requirements of an exemption under Rule 16b-3 promulgated under the Exchange Act, or (2) is a subsequent transaction the terms of which were provided for in a transaction initially meeting the requirements of an exemption under Rule 16b-3 promulgated under the Exchange Act.  Unless a Unit Incentive Agreement provides otherwise, the payment of cash in lieu of whole or fractional Units or in lieu of whole or fractional units of a successor shall be considered a subsequent transaction approved by the original grant of an Option.

11.2    **General Rule for UARs.**  Except as otherwise provided in a Unit Incentive Agreement, if a Change of Control occurs, and if the agreements effectuating the Change of Control do not provide for the assumption or substitution of all Unit Appreciation Rights granted under this Plan, with respect to any Unit Appreciation Right granted under this Plan that is not so assumed or substituted (a "**Non-Assumed UAR**"), the Committee, in its complete and absolute discretion, may, with respect to any or all of such Non-Assumed UARs (including the possibility of different treatment with respect to different Participants), take any or all of the following actions to be effective as of the date of the Change of Control (or as of any other date fixed by the Committee occurring within the twenty-five (25) day period ending on the date of the Change of Control, but only if such action remains contingent upon the effectuation of the Change of Control) (such date referred to as the "**Action Effective Date**"), notwithstanding any provision of Section 12.3 of this Plan:

(a)    Accelerate (in whole or in part) the vesting and/or exercisability of such Non-Assumed UAR on or before a specified Action Effective Date; and/or

(b)    Unilaterally cancel all or any portion of any such Non-Assumed UAR which has not vested or which has not become exercisable as of a specified Action Effective Date (regardless of whether such Non-Assumed UAR has any intrinsic value); and/or

(c)    Unilaterally cancel all or any portion of any such Non-Assumed UAR as of a specified Action Effective Date in exchange for:

(1)    whole and/or fractional Units (or for whole Units and cash in lieu of any fractional Unit) that, in the aggregate, are equal in value to the excess of the Fair Market Value of the Units subject to such Non-Assumed UAR being cancelled determined as of the Action Effective Date (taking into account vesting and/or exercisability) minus the aggregate UAR Exercise Price for such Units subject to such Non-Assumed UAR; and/or

(2)    cash or other property equal in value to the excess of the Fair Market Value of any Units (or fractional Units) subject to all or any portion of such Non-Assumed UAR being cancelled determined as

Charter Up Holdings, LLC 2019 Unit Incentive Plan
Page 17

of the Action Effective Date (taking into account vesting and/or exercisability) minus the aggregate UAR Exercise Price for such Units subject to such Non-Assumed UAR; and/or

(d)    Unilaterally cancel all or any portion of any such Non-Assumed UAR as of a specified Action Effective Date in exchange for cash or other property equal in value to the excess of the Change of Control Value of any Units (or fractional Units) subject to all or the portion of such Non-Assumed UAR being cancelled determined as of the Action Effective Date (taking into account vesting and/or exercisability) minus the aggregate UAR Exercise Price for such Units; and/or

(e)    Unilaterally cancel all or any portion of such Non-Assumed UAR as of a specified Action Effective Date after providing the holder of such UAR with (1) an opportunity to exercise all or the portion of such Non-Assumed UAR being cancelled to the extent vested and/or exercisable (taking into account vesting and/or exercisability as of the date of the Change of Control) on or before such Action Effective Date, and (2) reasonable notice of such opportunity to exercise prior to such Action Effective Date; and/or

(f)    Unilaterally require the exercise of, and unilaterally cause the exercise of, all or any portion of any such Non-Assumed UAR as of a specified Action Effective Date; and/or

(g)    Unilaterally cancel all or any portion of such Non-Assumed UAR and notify the holder of such UAR of such action, but only if the Fair Market Value of the Units subject to all or the portion of such Non-Assumed UAR being cancelled determined as of the Action Effective Date (taking into account vesting and/or exercisability) does not exceed the aggregate UAR Exercise Price for such Units.

However, notwithstanding the foregoing, to the extent that the Participant holding a Non-Assumed UAR is an Insider, payment of cash in lieu of whole or fractional Units or units of a successor may only be made to the extent that such payment (1) has met the requirements of an exemption under Rule 16b-3 promulgated under the Exchange Act, or (2) is a subsequent transaction the terms of which were provided for in a transaction initially meeting the requirements of an exemption under Rule 16b-3 promulgated under the Exchange Act. Unless a Unit Incentive Agreement provides otherwise, the payment of cash in lieu of whole or fractional Units or in lieu of whole or fractional units of a successor shall be considered a subsequent transaction approved by the original grant of a UAR.

11.3    **General Rule for Deferred Units.**  Except as otherwise provided in a Unit Incentive Agreement, if a Change of Control occurs, and if the agreements effectuating the Change of Control do not provide for the assumption or substitution of all Deferred Units granted under this Plan, with respect to any Deferred Unit granted under this Plan that is not so assumed or substituted (a "**Non-Assumed DSU**"), the Committee, in its complete and absolute discretion, may, with respect to any or all of such Non-Assumed DSUs (including the possibility of different treatment with respect to different Participants), take any or all of the following actions to be effective as of the date of the Change of Control (or as of any other date fixed by the Committee occurring within the twenty-five (25) day period ending on the date of the Change of Control, but only if such action remains contingent upon the effectuation of the Change of Control) (such date referred to as the "**Action Effective Date**") *and* only if such action does not cause the affected Non-Assumed DSU to fail to comply with Code §409A or to fail to be exempt from Code §409A, notwithstanding any provision of Section 12.3 of this Plan:

(a)    Accelerate (in whole or in part) the vesting of such Non-Assumed DSU on or before a specified Action Effective Date; and/or

(b)    Unilaterally cancel all or any portion of any such Non-Assumed DSU which has not vested as of a specified Action Effective Date (regardless of whether such Non-Assumed DSU has any intrinsic value); and/or

(c)    Unilaterally cancel all or any portion of such Non-Assumed DSU as of a specified Action Effective Date and notify the holder of such Non-Assumed DSU of such action, but only if the Fair Market Value of the Units that were subject to all or the portion of such Non-Assumed DSU being cancelled determined as of the Action Effective Date (taking into account vesting) is zero.

However, notwithstanding the foregoing, to the extent that the Participant holding a Non-Assumed DSU is an Insider, payment of cash in lieu of whole or fractional Units or units of a successor may only be made to the extent that such payment (1) has met the requirements of an exemption under Rule 16b-3 promulgated under the Exchange Act, or (2) is a subsequent transaction the terms of which were provided for in a transaction initially meeting the requirements of an exemption under Rule 16b-3 promulgated under the Exchange Act.

Unless a Unit Incentive Agreement provides otherwise, the payment of cash in lieu of whole or fractional Units or in lieu of whole or fractional units of a successor shall be considered a subsequent transaction approved by the original grant of a Deferred Unit.

**11.4    General Rule for Other Unit Incentive Agreements.**  If a Change of Control occurs, then, except to the extent otherwise provided in the Unit Incentive Agreement pertaining to a particular Unit Incentive or as otherwise provided in this Plan, each Unit Incentive shall be governed by applicable law and the documents effectuating the Change of Control.

## 12    AMENDMENT OR TERMINATION

**12.1    Amendment of the Plan.**  This Plan may be amended by the Board from time to time to the extent that the Board deems necessary or appropriate, and, in all cases, the Board shall determine whether approval by the Unit holders shall be requested and/or required in its complete and absolute discretion after due consideration of such matters.  Any amendment of the Plan shall be applicable to outstanding Unit Incentives, except to the extent that such amendment diminishes the rights or benefits of a Participant under a Unit Incentive which has been granted prior to the date of such amendment (*provided, however*, that a modification, amendment or cancellation that results solely in a change in the tax consequences with respect to a Unit Incentive shall not be deemed as a diminishment of rights or benefits of such Unit Incentive), and to such extent, the amendment shall not be applicable to such Unit Incentive unless (a) the Participant holding such Unit Incentive consents in writing to such, (b) this Plan and/or such Unit Incentive expressly allows such to occur, or (c) the Company would otherwise have the right to make such amendment by applicable law.

**12.2    Suspension of Awards & Termination of Plan.**  The Board may suspend the granting of Unit Incentives under this Plan at any time and may terminate this Plan at any time.  (*See also* Section 4 for a special provision providing for automatic termination of this Plan in certain circumstances.)

**12.3    Amendment of Outstanding Unit Incentives.**  The Company shall have the right to modify, amend or cancel any Unit Incentive after it has been granted if (a) the modification, amendment or cancellation does not diminish the rights or benefits of the Participant under the Unit Incentive (*provided, however*, that a modification, amendment or cancellation that results *solely* in a change in the tax consequences with respect to a Unit Incentive shall not be deemed as a diminishment of rights or benefits of such Unit Incentive), (b) the Participant consents in writing to such modification, amendment or cancellation, (c) there is a dissolution or liquidation of the Company, (d) this Plan and/or the Unit Incentive Agreement expressly provides for such modification, amendment or cancellation, or (e) the Company would otherwise have the right to make such modification, amendment or cancellation by applicable law.  No modification, amendment or cancellation of an outstanding Unit Incentive which is expressly allowed under any other provision of this Plan shall be subject to the provisions of this Section 12.3.

## 13    MISCELLANEOUS

**13.1    Unit holder Rights.**  No Participant shall have any rights as a Unit holder of the Company as a result of the grant of a Unit Incentive to him or to her under this Plan or his or her exercise of such Unit Incentive until (i) the Units subject to such Unit Incentive have been recorded on the Company's official Unit holder records as having been issued and transferred to such Participant, and (ii) the Participant has executed an agreement by which the Participant agrees to be bound by, and subject to, any agreement(s) among the Company's Unit holders then in effect.  Upon the grant of a Unit Incentive or a Participant's exercise of such Unit Incentive, the Company will have a reasonable period in which to issue and transfer the Units to the Participant, and the Participant will not be treated as a Unit holder for any purpose whatsoever prior to such issuance and transfer.

**13.2    No Guarantee of Continued Relationship.**  The grant of a Unit Incentive to a Participant under this Plan shall not constitute a contract of employment or a contract to perform services and shall not confer on a Participant any rights upon his or her termination of employment or relationship with the Company, or any Parent or Subsidiary thereof, in addition to those rights, if any, expressly set forth in the Unit Incentive Agreement that evidences his or her Unit Incentive.

**13.3    Withholding.**  The Company shall have the power and the right to deduct or withhold, or require a Participant to remit to the Company, or any Parent or Subsidiary thereof, as a condition precedent for the fulfillment of any Unit Incentive, an amount sufficient to satisfy Federal, state and local taxes, domestic or foreign, required by law or regulation to be withheld with respect to any taxable event arising as a result of this Plan and/or any action taken by a Participant with respect to a Unit Incentive.  Whenever Units are to be issued

to a Participant upon exercise of an Option or a Unit Appreciation Right, or satisfaction of conditions under a Deferred Unit, or grant of (if a Code §83(b) election is properly made) or substantial vesting of a Restricted Unit Award, the Company, or any Parent or Subsidiary thereof, shall have the right to require the Participant to remit to the Company, or any Parent or Subsidiary thereof, as a condition of exercise of the Option or Unit Appreciation Right, or as a condition to the fulfillment of the Deferred Unit, or as a condition to the grant (if a Code §83(b) election is properly made) or substantial vesting of the Restricted Unit Award, an amount in cash (or, unless the Unit Incentive Agreement provides otherwise, in Units) sufficient to satisfy federal, state and local withholding tax requirements at the time of such exercise, satisfaction of conditions, or grant (if a Code §83(b) election is properly made) or substantial vesting. However, notwithstanding the foregoing, to the extent that a Participant is an Insider, satisfaction of withholding requirements by having the Company, or any Parent or Subsidiary thereof, withhold Units may only be made to the extent that such withholding of Units (1) has met the requirements of an exemption under Rule 16b-3 promulgated under the Exchange Act, or (2) is a subsequent transaction the terms of which were provided for in a transaction initially meeting the requirements of an exemption under Rule 16b-3 promulgated under the Exchange Act. Unless the Unit Incentive Agreement provides otherwise, the withholding of units to satisfy federal, state and local withholding tax requirements shall be a subsequent transaction approved by the original grant of a Unit Incentive. Notwithstanding the foregoing, in no event shall payment of withholding taxes be made by a retention of Units by the Company, or any Parent or Subsidiary thereof, unless the Company, or any Parent or Subsidiary thereof, retains only Units with a Fair Market Value equal to or less than the minimum amount of taxes required to be withheld.

**13.4    Unfunded Plan.** To the extent that cash or property is payable to a participant under this Plan, such cash or property will be paid by the Company from its general assets, and any Person entitled to such a payment under the Plan will have no rights greater than the rights of any other unsecured general creditor of the Company. Units to be distributed hereunder will be issued directly by the Company from its authorized but unissued or "treasury" Unit or a combination thereof. The Company will not be required to segregate on its books or otherwise establish any funding procedure for the amount to be used for the payment of benefits under the Plan. If, however, the Company determines to reserve Units or other assets to discharge its obligations hereunder, such reservation will not be deemed to create a trust or other funded arrangement.

**13.5    No Fiduciary Relationship.** Nothing contained in this Plan and no action taken pursuant to the Plan shall create or be construed to create a trust of any kind or any fiduciary relationship between the Company, or any Subsidiary or Parent on the one hand, and any Participant or executor, administrator, or other personal representative or designated beneficiary of such Participant or any other Persons on the other hand.

**13.6    Relationship to Other Compensation Plans.** The adoption of this Plan shall not affect any other Unit option, incentive, or other compensation plans in effect for the Company, a Parent, or a Subsidiary, nor shall the adoption of this Plan preclude the Company or a Parent or Subsidiary from establishing any other form of incentive or other compensation plan for Employees or Key Persons of the Company or a Parent or Subsidiary.

**13.7    Governing Law.** The granting of Unit Incentives under this Plan, the exercisability of any Unit Incentives and the issuance of Units shall be subject to all applicable laws, rules, and regulations and to such approvals by any governmental agencies or national securities exchanges as may be required by applicable law. Specifically, the laws of the State of Delaware shall govern this Plan and any Unit Incentive Agreement issued hereunder. If Delaware's conflict of law rules would apply another state's laws, the laws of the State of Delaware shall still govern.

**14    SPECIAL PROVISIONS APPLICABLE TO DEFERRED COMPENSATION AWARDS**

**14.1    Interpretation of Deferred Compensation Awards.** A Unit Incentive granted under this Plan shall be interpreted and administered in a manner so that any amount or benefit payable thereunder shall be paid or provided in a manner that is exempt from Code §409A if at all possible. However, to the extent that a Unit Incentive granted under this Plan constitutes deferred compensation subject to Code §409A, the Unit Incentive Agreement shall be interpreted to be compliant with the requirements of Code §409A and applicable Internal Revenue guidance and Treasury Regulations issued thereunder. The term "payment" as used in this Section 14 shall refer to the exercise or disposition of any Option or Unit Appreciation Right, any lapse of a substantial risk of forfeiture with respect to a transfer of property which was subject to such a substantial risk of forfeiture, or any other transfer of cash or other consideration pursuant to the exercise or disposition of a Unit Incentive granted hereunder subject to federal income taxation.

Charter Up Holdings, LLC 2019 Unit Incentive Plan
Page 20

Option grant ES-10 to Thomas Chris Bragg

**14.2    *No Guarantee of Tax Treatment.*** The tax treatment of the benefits provided under any Unit Incentive granted under this Plan is not warranted or guaranteed. Neither the Company, nor its members or the members of the Board, officers, employees or advisers shall be held liable for any taxes, interest, penalties, or other monetary amounts owed by a Participant as a result of the application of the Code (including Code §409A) or any state tax law.

**14.3    *Separation from Service Required.*** To the extent that a Unit Incentive granted under this Plan to a Participant provides deferred compensation subject to Code §409A, then, notwithstanding anything in this Plan or in the Unit Incentive Agreement pertaining to such Unit Incentive to the contrary, any payment of such deferred compensation that is required by reason of the termination of employment of, or the cessation of services by, such Participant, shall not be payable to the Participant by reason of such termination or cessation unless the circumstances giving rise to such termination or cessation constitute a Separation from Service of such Participant. If this Section 14.3 prevents the payment or distribution of any amount, such amount shall be paid on the date, if any, on which an event occurs that constitutes a Separation from Service, or such later date as may be required by Section 14.4 below.

**14.4    *Six Month Delay for Specified Employees.*** To the extent that a Unit Incentive granted under this Plan to a Participant provides deferred compensation subject to Code §409A, then, notwithstanding anything in this Plan or in the Unit Incentive Agreement pertaining to such Unit Incentive to the contrary, any payment of such deferred compensation subject to Code §409A by reason of such Participant's Separation from Service occurring during a period in which such Participant is a Specified Employee shall be subject to the following:

**(a)**    *Lump Sum Payments.* If the payment is payable in a lump sum, the Participant's right to receive the payment of such deferred compensation will be delayed until the earlier of the Participant's death or the first day of the seventh (7th) month following the Participant's Separation from Service.

**(b)**    *Payments over Time.* If the payment is payable over time, the amount of such deferred compensation that would otherwise be payable during the six-month period immediately following the Participant's Separation from Service will be accumulated and the Participant's right to receive payment of such accumulated amount will be delayed until the earlier of (i) a date no later than thirty (30) days after the Participant's death, or (ii) the first day of the seventh (7th) month following the Participant's Separation from Service, whereupon the accumulated amount will be paid to the Participant on such date and the normal payment schedule for any remaining payments will resume.

**14.5    *Series of Payments.*** To the extent that a Unit Incentive granted under this Plan to a Participant provides deferred compensation subject to Code §409A, then, notwithstanding anything in this Plan or in the Unit Incentive Agreement pertaining to such Unit Incentive to the contrary, any right to a series of installment payments under such Unit Incentive shall, for purposes of Code §409A, be treated as a right to a series of separate payments.

**14.6    *No Acceleration of Payments.*** To the extent that a Unit Incentive granted under this Plan to a Participant provides deferred compensation subject to Code §409A, then, notwithstanding anything in this Plan or in the Unit Incentive Agreement pertaining to such Unit Incentive to the contrary, no amount that would be payable pursuant to the Unit Incentive and the terms of this Plan may be accelerated. The provisions of this Section 14.6 shall not preclude the acceleration of vesting of a Unit Incentive, nor the forfeiture of a Unit Incentive.

**14.7    *Unfunded Unsecured Obligations.*** To the extent that a Unit Incentive granted under this Plan to a Participant provides deferred compensation subject to Code §409A, then, notwithstanding anything in this Plan or in the Unit Incentive Agreement pertaining to such Unit Incentive to the contrary, any obligation of payment required with respect to such deferred compensation shall be a mere unfunded, unsecured obligation of the Company, and shall not provide any Participant a right to any specific asset of the Company.

**14.8    *Application of Certain Plan Provisions.*** To the extent that a Unit Incentive granted under this Plan to a Participant provides deferred compensation subject to Code §409A, then, notwithstanding anything in this Plan or in the Unit Incentive Agreement pertaining to such Unit Incentive to the contrary, any provisions of this Plan (other than those set forth in this Section 14) that would modify the timing of a payment of such deferred compensation to such Participant holding such Unit Incentive shall be ignored and shall be deemed not applicable. For example, the provisions of this Plan (a) that are contrary to the exercise provisions of an Option or Unit Appreciation Right that provides for such deferred compensation (such as the provisions of Sections 7.2(f) or 7.3(c) delaying exercise after hardship distributions), (b) that provide for exercise in certain

situations following a Change of Control that are not allowed by the Unit Incentive (such as provisions in Section 11), (c) that would result in an acceleration of payment (for example, Sections 7.2(f) or 7.3(c) providing the Board the ability to accelerate the time at which an Option or Unit Appreciation Right may be exercised), or (d) that provide for transferability of an Option beyond that allowed by Section 14.9 below) shall **not** be applicable to a Unit Incentive to the extent that it provides for deferred compensation subject to Code §409A notwithstanding any provision of this Plan or any Unit Incentive to the contrary.   However, notwithstanding the foregoing, it is intended that the discretion of the Company pursuant to the provisions of Treas. Reg. §1.409A-3(j)(4)(ii) through (xiv) shall apply with respect to Unit Incentives granted under this Plan to a Participant to the extent that such Unit Incentives provide deferred compensation subject to Code §409A.

**14.9**    **Non-Transferable.**   To the extent that a Unit Incentive granted under this Plan to a Participant provides deferred compensation subject to Code §409A, then, notwithstanding anything in this Plan or in the Unit Incentive Agreement pertaining to such Unit Incentive to the contrary, such Unit Incentive may not be encumbered or transferred in any manner, other than by will or by the laws of descent and distribution.

## 15    COMPANY REPURCHASE OPTION

**15.1**    **Repurchase Option.**   The Company shall have the option to repurchase all or a portion of any Units issued pursuant to a Unit Incentive granted under this Plan on the terms and conditions set forth in this Section 15 (the **"Repurchase Option"**) if a Participant should cease to perform services for the Company for any reason, or no reason, including, without limitation, the Participant's death, Disability, voluntary resignation or termination by the Company with or without Cause.

**15.2**    **Right of Termination Unaffected.**   Nothing in this Plan or in any Unit Incentive Agreement shall be construed to limit or otherwise affect in any manner whatsoever the right or power of the Company to terminate a Participant's services for the Company at any time, for any reason or no reason, with or without Cause.

**15.3**    **Exercise of Repurchase Option.**   At any time after the date on which a Participant ceases to be in the Continuous Service of the Company, or any Parent or Subsidiary, the Company may elect to repurchase any or all of the Units of a Participant issued pursuant to a Unit Incentive granted under this Plan by giving the Participant written notice of exercise of the Repurchase Option.   In the event that a Participant is choosing to exercise an Option to purchase Units granted under this Plan, the Company may exercise its Repurchase Right simultaneously with the issuance of the Units so that the Participant will actually own the Units only momentarily.

**15.4**    **Calculation of Repurchase Price.**

   **(a)**    **Cessation of Services Not for Cause.**   In the event that a Participant ceases performing services for the Company for any reason other than cessation of such services by the Company for Cause or by reason of the resignation or refusal to perform services by the Participant, the Company or its assignee shall have the option to repurchase from the Participant (or from the Optionee's personal representative as the case may be) any or all of the Units of such Participant issued pursuant to a Unit Incentive granted under this Plan at a price equal to the Fair Market Value of such Units as of the date that the Company gives written notice of exercise of the Repurchase Option.

   **(b)**    **Cessation of Services for Cause or Certain Other Reasons.**   In the event that a Participant ceases performing services for the Company because of the cessation of such services by the Company for Cause or by reason of the resignation or refusal to perform services by the Participant, the Company or its assignee shall have the option to repurchase from the Participant (or from the Optionee's personal representative as the case may be) any or all of the Units of such Participant issued pursuant to a Unit Incentive granted under this Plan at a price equal to the lesser of (i) the Fair Market Value of such Units as of the date that the Company gives written notice of exercise of the Repurchase Option, or (ii) the amount paid by the Participant for such Units, if any.

**15.5**    **Payment of Repurchase Price.**   The repurchase price shall be payable, at the discretion of the Company or its assignee, by (a) check, (b) by cancellation of all or a portion of any outstanding indebtedness of the Participant to the Company or such assignee, (c) by delivery of a promissory note of the Company payable over a period not to exceed ten years from the date of repurchase and which shall accrue interest on the unpaid principal amount at a per annum interest rate equal to the applicable federal rate ("AFR" rate) for such note, or (d) any combination of the foregoing.

**15.6**    *Termination of Repurchase Option.*    The Repurchase Option shall terminate as to any Units issued to a Participant under this Plan ninety (90) days after an Initial Public Offering of such Units.

**16    Special Provisions Applicable to California Options**

The provisions of this Section 16 shall apply, and be reflected in any Unit Incentive Agreement pertaining to, any Unit Incentives granted hereunder to the extent required to comply with the Corporate Securities Law of 1968 of the State of California and the regulations promulgated thereunder.  To the extent there is a conflict between any other terms of the Plan and the terms contained in this Section 16 of the Plan, the terms of this Section 16 shall be controlling, and any provision of the Plan that would be contrary to such California law shall not apply to the Options described in this Section.  This Section 16 shall be construed in a manner consistent with the applicable provisions of the California Code of Regulations.

**16.1    Grant of Options.**  Each Option must be granted or issued under the Plan within ten (10) years from the Effective Date of this Plan or the date the Plan is approved by the Company's Managers, whichever is earlier.

**16.2    Exercise Period of Options.**  Each Option will have an exercise period of not more than 120 months from the date of grant.

**16.3    Exercise of Options Following Termination of Employment.** Unless the Optionee's employment is terminated for "cause" as defined in the Award Agreement, the Optionee shall have the right to exercise the vested portion of the Option for: (i) at least six months from the date of Termination of Employment, if termination was caused by death or disability; or (ii) at least thirty days from the date of Termination of Employment, if termination was caused by other than death or disability.

**16.4    Nontransferability of Options.** The right to acquire Unit pursuant to Options shall be nontransferable other than by will, by the laws of descent and distribution, to a revocable trust, or as permitted by Rule 701 promulgated under the Securities Act.

**16.5    Adjustments by the Managers.** Notwithstanding anything to the contrary in Section 10 of the Plan, the Managers shall in any event make such adjustments as may be required by Section 25102(o) of the California Corporations Code.

**16.6    Disclosure of Financial Information by the Company.** The Company shall furnish financial statements at least annually to each California Participant; provided, however, the Company shall not be required to provide such information if (i) the issuance is limited to key persons whose duties in connection with the Company assure their access to equivalent information, or (ii) the Plan or any agreement complies with all conditions of Rule 701 of the Securities Act of 1933, as amended, provided that for purposes of determining such compliance, any registered domestic partner shall be considered a "family member" as that term is defined in Rule 701.

APPROVED by the Board of Managers of the Company on May 1, 2019

APPROVED by the Members of the Company on May 1, 2019

# EXHIBIT B

# CHARTER UP HOLDINGS, LLC 2019 UNIT INCENTIVE PLAN
## UNIT OPTION AGREEMENT

Charter Up Holdings, LLC, a Delaware limited liability company (the "**Company**"), hereby grants as of the date noted below (the "**Grant Date**") to the optionee named below (the "**Optionee**") an option (this "**Option**") to purchase the total number of Units shown below of the Company ("**Units**") at the exercise price per Unit set forth below (the "**Exercise Price**"), subject to all of the terms and conditions on the reverse side of this Unit Option Agreement and the Charter Up Holdings, LLC 2019 Unit Incentive Plan (the "**Plan**"). Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Plan. The terms and conditions set forth on the reverse side hereof and the terms and conditions of the Plan are incorporated herein by reference.

Units Subject to Option: [As described on Carta / eShares]

Exercise Price Per Unit: [$ amount as described on Carta / eShares]

Vesting Start Date: [As described on Carta / eShares]

Option Expiration Date: [As described on Carta / eShares]

Grant Date: [As described on Carta / eShares]

**Vesting:**
Units subject to issuance under this Option shall be eligible for exercise according to the vesting schedule described in Section 1 on the reverse of this Unit Option Agreement.

**Forfeiture:**
Rights and benefits under this Option are subject to forfeiture. See Section 3(e) on the reverse side hereof.

*IN WITNESS WHEREOF*, this Unit Option Agreement has been executed by the Company by a duly authorized officer as of the date specified hereon.

CHARTER UP HOLDINGS, LLC

By: _____
Name: [As described on Carta / eShares]
Title: [As described on Carta / eShares]

Type of Unit Option Intended:

| X | Non-Qualified Option (NQO) |

Optionee hereby acknowledges receipt of a copy of the Plan, represents that Optionee has read and understands the terms and provisions of the Plan, and accepts this Option subject to all of the terms and conditions of the Plan and this Unit Option Agreement. Optionee acknowledges that there may be adverse tax consequences upon exercise of this Option or disposition of Units purchased by exercise of this Option, and that Optionee should consult a tax adviser prior to such exercise or disposition.

_____
[As described on Carta / eShares]

1    *Vesting and Exercise of Units.*

(a)    Subject to the terms of the Plan, this Unit Option Agreement and the Exercise Agreement (as defined in Section 4(a) below), the Optionee shall be entitled to purchase, pursuant to the exercise of this Option and only prior to the Option Expiration Date, the percentage of the Units subject to this Option shown below based upon the Continuous Service of the Optionee from the Vesting Start Date of this Option (as noted hereon) at the time of exercise:

| Vesting Schedule: | | | |
|---|---|---|---|
| Vesting Date(s) | Options Vested | Cumulative Vested | Percentage Vested |
| [As described on Carta / eShares] | [As described on Carta / eShares] | [As described on Carta / eShares] | [As described on Carta / eShares] |

(b)    Notwithstanding the vesting schedule in Section 1(a), subject to Section 2, the Managers may, in their sole discretion accelerate or otherwise waive the vesting schedule set forth above.

(c)    If the above calculation of Units available for purchase through exercise of this Option would result in a fraction, any fraction will be rounded to zero. To the extent that this Option has been exercised with respect to the Units, no further exercise may be made with respect to such Units.

(d)    Acceleration terms for early vesting, if applicable, will be as described on eShares, Inc. DBA Carta, Inc. platform.

2    *Restrictions on Exercise.* This Option may not be exercised, unless such exercise is in compliance with the Securities Act of 1933, as amended, and all applicable state securities laws, as they are in effect on the date of exercise, and the requirements of any stock exchange or national market system on which the Company's Units may be listed at the time of exercise. Optionee understands that the Company is under no obligation to register, qualify or list the Units subject to this Option with the Securities and Exchange Commission, any state securities commission or any stock exchange to effect such compliance. Also, this Option may not be exercised: (1) within the first six (6) months of the Grant Date noted hereon (except in situations otherwise allowed by this Option and Section 7(e)(8)(B) of the FLSA) if the Optionee is currently, at the time of exercise, or has been at any time within the two (2) year period immediately preceding exercise, a non-exempt (as defined in the Fair Labor Standards Act) employee of the Company; and (2) until the Action Effective Date following a Change of Control. For the avoidance of doubt, this Option may only be exercised for Units in the Company and not of any Parent or Subsidiary thereof.

3    *Termination of Option.* Except as provided below in this Section, this Option shall be immediately forfeited, along with any and all rights or subsequent rights related hereto, and may not be exercised after the date which is ninety (90) days after the Optionee's "*Termination Date*" (the date on which Optionee ceases to be in the Continuous Service (as defined in the Plan) of the Company, or any Parent or Subsidiary), or, if earlier, the Option Expiration Date. Prior thereto, this Option shall continue to be exercisable, but only to the extent that it is vested on the Termination Date. The Managers shall have complete and absolute discretion to determine an Optionee's Termination Date.

(a)    *Early Termination for Cause.* If Optionee ceases to perform services for the Company, or any Parent or Subsidiary, for Cause, this Option shall immediately be forfeited, along with any and all rights or subsequent rights related hereto, as of the Optionee's Termination Date, or, if earlier, the Option Expiration Date. For this purpose, "*Cause*" shall be defined as set forth in a written employment agreement between the Optionee and the Company in existence as of the Grant Date, or, if no such written agreement exists or if "Cause" is not defined in such written employment agreement, "Cause" shall be defined as set forth in the Plan, or, if not defined in the Plan, "Cause" shall mean actions or omissions harmful to the Company as determined by the Managers in their complete and absolute discretion.

(b)    *Death.* If Optionee ceases to perform services for the Company, or any Parent or Subsidiary, as a result of the death of Optionee, this Option shall immediately be forfeited, along with any and all rights or subsequent rights related hereto, as of the one year anniversary of the Optionee's Termination Date, or, if earlier, the Option Expiration Date. Prior thereto, this Option shall continue to be exercisable, but only to the extent that it is vested on the Termination Date.

(c)    *Disability.* If Optionee ceases to perform services for the Company, or any Parent or Subsidiary, as a result of Disability of Optionee (as determined by the Managers in their complete and absolute discretion), this Option shall immediately be forfeited, with any and all rights or subsequent rights related hereto, as of the one year anniversary of the Optionee's Termination Date, or, if earlier, the Option Expiration Date. Prior thereto, this Option shall continue to be exercisable, but only to the extent that it is vested on the Termination Date.

(d)    *No Right to Employment or Other Relationship.* Nothing in the Plan or this Unit Option Agreement shall confer on Optionee any right to continue in the employ of, or other relationship with, the Company, or any Parent or Subsidiary, or limit in any way the right of the Company, or any Parent or Subsidiary, to terminate Optionee's employment or other relationship at any time, with or without Cause.

(e)    *Condition to Exercise & Possible Forfeiture.* Notwithstanding the foregoing, the Optionee's ability to exercise this Option on or after the Optionee's Termination Date shall

be contingent upon the Optionee's execution, compliance and non-revocation of a Separation and Release Agreement approved by the Company whereby the Optionee releases the Company from any and all liability and claims of any kind. Furthermore, Optionee does hereby agree that this Option shall immediately be forfeited, along with any and all rights or subsequent rights related hereto, if Optionee engages in any of the Forfeiture Activities (as defined in the Plan), and that if, subsequent to the exercise of this Option, Optionee engages in any of the Forfeiture Activities, then the Company shall have the right (but not the obligation) at any time after the Optionee engages in any of the Forfeiture Activities to rescind the exercise, payment and delivery of the Units as follows: (A) The Company may repurchase any Units purchased pursuant to the exercise of this Option which the Optionee may then possess at a per Unit price equal to the Exercise Price (as noted on the reverse side of this Agreement), and (B) The Company shall be entitled to request that Optionee forfeit and return to the Company any profits (amounts received in excess of the exercise price paid by the Optionee for the Units) which Optionee received at the time of Optionee's disposition of any Units purchased pursuant to the exercise of this Option, and, upon such request, Optionee shall forfeit and return to the Company any such profits within ten (10) calendar days of notice from the Company. OPTIONEE ACKNOWLEDGES AND AGREES THAT IF OPTIONEE ENGAGES IN ANY OF THE FORFEITURE ACTIVITIES, OPTIONEE SHALL FORFEIT RIGHTS AND BENEFITS AS SET FORTH ABOVE. FURTHER, OPTIONEE ACKNOWLEDGES AND AGREES THAT OPTIONEE'S PARTICIPATION IN THE PLAN AND THIS UNIT OPTION AGREEMENT ARE VOLUNTARY, AND THAT OPTIONEE ...NO...INGLY AND VOLUNTARIL'' AGREES THAT OPTIONEE S RIGHTS AND BENEFITS UNDER THIS UNIT OPTION AGREEMENT ARE E..PRESSLY SU...E..T TO FORFEITURE AS SET FORTH A..OVE.

*anner .. ...erc.se*

.    *E..er..e Agreement.* This Option shall be exercisable by delivery to the Company of an executed exercise agreement ("*Exercise Ag.eement*") in such form as may be approved or accepted by the Company, which shall set forth Optionee's election to exercise this Option with respect to some or all of the Units subject to this Option, the number of Units subject to this Option being purchased, and any restrictions imposed on the Units subject to this Option (including, without limitation, vesting or performance based restrictions, rights of the Company to re-purchase Units acquired pursuant to the exercise of an Option, voting restrictions, investment intent restrictions, restrictions on transfer, "first refusal" rights of the Company to purchase Units acquired pursuant to the exercise of an Option prior to their sale to any other person, "drag along" rights requiring the sale of units to a third party purchaser in certain circumstances, "lock up" type restrictions in the case of an initial public offering of the Company's Units, restrictions or limitations that would be applied to Unit holders under any applicable restriction agreement among the Unit holders, and restrictions under applicable federal securities laws, under the requirements of any stock exchange or market upon which such Units are then listed and/or traded, and/or under any blue sky or state securities laws applicable to such Units). The Managers shall also require, as a condition for the acquisition of any Units by an Optionee pursuant to the exercise of an Option, that the Optionee execute an agreement by which the Optionee agrees to be bound by, and subject to, any agreement(s) among the Company's Unit holders then in effect, including, but not limited to, the Company's LLC Agreement, and which may include restrictions or limitations that would be applied to Unit holders under such agreements. The Company may modify the required Exercise Agreement at any time for any reason consistent with the Plan. If the Optionee receives a hardship distribution from a Code §401(k) plan of the Company, or any Parent or Subsidiary, this Option may not be exercised during the six (6) month period following the hardship withdrawal (unless the Company determines that such exercise would not jeopardize the tax qualification of such Code §401(k) plan).

.b)    *Exercise Price.* The Exercise Agreement shall be accompanied by full payment of the Exercise Price for the Units being purchased. Payment for the Units being purchased may be made in U.S. dollars in cash (by check), or, subject to the discretion of the Committee, by delivery to the Company of a number of Units having an aggregate fair market value equal to the amount to be tendered (including a "cashless" or "net unit" exercise), or a combination thereof. In addition, this Option may be exercised through a brokerage transaction following registration of the Units under Section 12 of the Securities Exchange Act of 1934, as amended, as permitted under the provisions of Regulation T promulgated by the Federal Reserve Board applicable to cashless exercises. Furthermore, if the Company so decides in its complete and absolute discretion, this Option may be exercised as to a portion or all (as determined by the Company) of the number of Units specified by delivery to the Company of a promissory note, as further set forth in the Plan.

(c)    *Withholding Taxes.* Prior to the issuance of Units upon exercise of this Option, Optionee must pay, or make adequate provision for, any applicable federal or state withholding obligations of the Company. Optionee may, to the extent allowed by the Company, provide for payment of withholding taxes upon exercise of the Option by requesting that the Company retain Units with a Fair Market Value equal to the minimum amount of taxes required to be withheld. In such case, the Company shall issue the net number of Units to Optionee by deducting the Units retained from the Units exercised.

(d)    *Issuance of Units.* Provided that the Exercise Agreement and payment are in form and substance satisfactory to counsel for the Company, the Company shall cause the Units purchased to be issued in the name of Optionee or Optionee's legal representative. Optionee shall not be considered a Unit holder until such time as Units have been issued as noted on the Unit holder register of the Company.

5    *Nontransferability of Option.* This Option may not be transferred in any manner, other than by will or by the laws of descent and distribution. In addition, except as expressly permitted under the Plan for NQOs, during Optionee's lifetime, this Option may be exercised only by Optionee. The terms of this Option shall be binding upon the

executor, administrators, successors and assigns of Optionee. Howe.. NQO, it may be transferred to the extent allowed by the Plan.

6    *Tax Consequences.* OPTIONEE UNDERSTANDS THAT THE GRA... THIS OPTION, AND THE SALE OF UNITS OBTAINED THROUGH THE EXERC... MAY HAVE TAX IMPLICATIONS THAT COULD RESULT IN ADVERSE TAX... OPTIONEE. OPTIONEE REPRESENTS THAT OPTIONEE HAS CONSULTED WI... WITH, HIS OR HER TAX ADVISOR; OPTIONEE FURTHER ACKNOWLEDGES T... RELYING ON THE COMPANY FOR ANY TAX, FINANCIAL OR LEGAL ADVICE; A... UNDERSTOOD BY THE OPTIONEE THAT NO REPRESENTATIONS OR ASSUR... TO THE QUALIFICATION OF THIS OPTION AS AN IUO OR AS TO ANY PARTIC... WITH RESPECT TO THE OPTION. OPTIONEE ALSO AC.NOWLEDGES THAT... OPTION MUST GENERALL, OCCUR WITHIN NINETY (90. DAYS OF TERMINAT... REGARDLESS OF ANY LON.ER PERIOD ALLOWED Y THIS UNIT OPTION A... THE COMPANY CANNOT AND HAS NOT .UARANTEED THAT THE .S WILL... UNIT EXERCISE PRICE OF THIS OPTION EUUALS OR EXCEEDS THE FAIR... UNIT ON THE GRANT DATE.

.    ..er..retatio.. .. .ove...i.g .a... . Any dispute regarding the... Unit Option Agreement shall be submitted to the Managers or the Co... review such dispute in accordance with the Plan. The resolution of s... Managers or the Committee shall be final and binding on the Compan... laws of the State of Delaware shall govern this Unit Option Agree... conflict of law rules would apply another state's laws, the parties agr... shall still govern.

8    *Entire Agreeme.. and Other M.....ers.* The Plan and the Exe... incorporated herein by this reference. Optionee acknowledges and ag... of this Option constitutes a full accord, satisfaction and release... commitments made to Optionee by the Company or any of its officers,... Unit holders or affiliates as of the Grant Date with respect to the issua... or rights to acquire securities, of the Company or any of its affiliate... Agreement, the Plan and the Exercise Agreement constitute the ent... parties hereto, and supersede all prior understandings and agreemen... subject matter hereof. This Unit Option Agreement and the underlyin... and become void ab initio unless this Unit Option Agreement has b... Optionee and the Optionee has agreed to all terms and provisions he... days of the Grant Date.

9    *Conse... to Jurisdictio.. .. Venue.* Optionee agrees that any... relating to this Unit Option Agreement shall be brought in a state... competent jurisdiction in Georgia. Optionee agrees to the personal ju... and/or federal courts located in Georgia. Optionee waives (a, any ob... or venue, or (b) any defense claiming lack of jurisdiction or improper... brought in such courts.

10    *Severability .. I.dependent E.forcement.* The provisions... Agreement are severable. If any provision is determined to b... unenforceable, in whole or in part, the remaining provisions and any... provisions shall remain in full force and effect. Section 3(e) above sha... agreement independent of any other agreement or provisions of this U... or the Plan, and the existence of any claim or cause of action by ... Company, whether predicated on the Plan, this Unit Option Agree... regardless of who was at fault and regardless of any claims that ei... Company may have against the other, shall not constitute a defense t... the Company of Section 3(e). The Company shall not be barred fro... ?(e) by reason of any breach of any other part of this Unit Option Ag... agreement with Optionee.

1    *S..e.ia. Cali'or.ia Provisio.s.* Notwithstanding any other... Option Agreement to the contrary, if the Optionee is a resident of... Options are subject to California state regulation, then the Option sh... repurchase rights and other obligations required of the Company in o... be exempt from the securities law of the State of California, and the ... Section 16 of the Plan.

**CHARTER UP HOLDINGS, LLC**
**2019 UNIT INCENTIVE PLAN**

EXERCISE AGREEMENT

This Exercise Agreement (the "Exercise Agreement") is made as of the date noted on the last page hereof by and between Charter Up Holdings, LLC, a Delaware limited liability company (the "Company") and the optionee named below ("Optionee") with respect to Optionee's exercise of that certain unit option grant described below (the "Option"), which was granted to Optionee under the Charter Up Holdings, LLC 2019 Unit Incentive Plan (the "Plan") and a Unit Option Certificate dated as of the Date of Grant set forth below (the "Option Certificate").

| | |
|---|---|
| Optionee: | |
| Social Security Number: | |
| Address: | |
| | |
| Number of Units Purchased: | |
| Price Per Unit | |
| Aggregate Purchase Price: | |
| Date of Grant: | |

Optionee hereby delivers to the Company the Aggregate Purchase Price in a form permitted in the Unit Option Certificate as follows (check as applicable and complete):

☐     *Payment by Check.*  By payment in cash or check in the amount of $_____, receipt of which is acknowledged by the Company.

Receipt of payment of the Aggregate Purchase Price is acknowledged by the Company.

The Company and Optionee hereby agree as follows:

        *Purchase of Units.*  On this date and subject to the terms and conditions of this Exercise Agreement, the Unit Option Certificate and the Plan, Optionee hereby exercises, subject to the contingencies below, the Option with respect to the "Number of Units Purchased" set forth above at the "Aggregate Purchase Price" set forth above and the "Price Per Unit" set forth above.  The term "Units" refers to the Incentive Units (as defined in the Plan) of the Company purchased under this Exercise Agreement.  Capitalized terms used in this Exercise Agreement that are not defined herein have the definitions ascribed to them in the Plan and the Agreement.

        *Representations of Purchaser.*  Optionee represents and warrants to the Company that:

        (a)     Optionee acknowledges that Optionee has received, read and understood the Plan and the Option and agrees to abide by and be bound by their terms and conditions;

(b)      Optionee is purchasing the Units for Optionee's own account for investment purposes only and not with a view to, or for sale in connection with, a distribution of the Units within the meaning of the Securities Act of 1933, as amended (the "1933 Act");

(c)      Optionee has no present intention of selling or otherwise disposing of all or any portion of the Units;

(d)      Optionee is fully aware of (i) the highly speculative nature of the investment in the Units; (ii) the financial hazards involved in the investment of the Units; and (iii) the lack of liquidity of the Units and the restrictions on transferability of the Units (*e.g.*, that Optionee may not be able to sell or dispose of the Units or use them as collateral for loans); and

(e)      Optionee is capable of evaluating the merits and risks of this investment, has the ability to protect Optionee's own interests in this transaction and is financially capable of bearing a total loss of this investment.

*Compliance with Federal and State Securities Laws.*      Optionee understands and acknowledges that, in reliance upon the representations and warranties made by Optionee herein, the Units have not been registered with the Securities and Exchange Commission ("SEC") under the 1933 Act, but have been issued under an exemption or exemptions from the registration requirements of the 1933 Act which impose certain restrictions on Optionee's ability to transfer the Units and have not been registered under the securities laws of any state. Optionee understands that Optionee may not transfer any Units unless such Units are registered under the 1933 Act and applicable state securities laws or unless, in the opinion of counsel to the Company, an exemption from such registration is available. Optionee understands that only the Company may file a registration statement with the SEC or with any applicable state, and that the Company is under no obligation to do so with respect to the Units. Optionee has also been advised that an exemption from registration may not be available or may not permit Optionee to transfer all or any of the Units in the amounts or at the times proposed by Optionee.

*Tax Consequences.*      OPTIONEE UNDERSTANDS THAT OPTIONEE MAY SUFFER ADVERSE TAX CONSEQUENCES AS A RESULT OF OPTIONEE'S PURCHASE OR DISPOSITION OF THE UNITS. OPTIONEE REPRESENTS THAT OPTIONEE HAS CONSULTED WITH ANY TAX CONSULTANT(S) OPTIONEE DEEMS ADVISABLE IN CONNECTION WITH THE PURCHASE OR DISPOSITION OF THE UNITS AND THAT OPTIONEE IS NOT RELYING ON THE COMPANY FOR ANY TAX ADVICE.

*Entire Agreement.*      The Plan and the Unit Option Certificate are incorporated herein by reference. This Exercise Agreement, the Plan and the Unit Option Certificate constitute the entire agreement of the parties and supersede in their entirety all prior undertakings and agreements of the Company and Optionee with respect to the subject matter hereof, and are governed by Delaware law except for that body of law pertaining to conflict of laws. By using this Exercise Agreement, the parties acknowledge and agree to the exercise of the Option through the use of this Exercise Agreement in lieu of that attached to the agreement evidencing the Option, and to the replacement of such attachment by this Exercise Agreement.

*Joinder to Limited Liability Company Agreement.*      As a condition to the effectiveness of this Exercise Agreement, Optionee shall join and become a party to that certain Limited Liability Company Agreement of Charter Up Holdings, LLC, dated as of May 1, 2019, by and between the

Exercise Agreement

Company and the other parties thereto, by executing a counterpart signature page to the Limited Liability Company Agreement in the form attached as Exhibit A.

*¡Signatures follow on next page.¡*

Exercise Agreement

*IN WITNESS WHEREOF*, this Exercise Agreement is executed and effective as of this _____ day of _____, 20___.

Submitted by:                                     Accepted by:

**OPTIONEE:**                                     **COMPANY:**

**[NAME]**                                        **CHARTER UP HOLDINGS, LLC**

                                                  By:
                                                  Title:

Dated:                                            Dated:

*[Signature Page to Exercise Agreement]*

Option grant ES-10 to Thomas/Chris Bragg

<u>Exhibit A</u>

**Form of Joinder Agreement**

[Please see attached.]

## FORM OF COUNTERPART AND JOINDER AGREEMENT

The undersigned agrees to become a party to the Limited Liability Company Agreement of Charter Up Holdings, LLC, a Delaware limited liability company, dated as of May 1, 2019 (the "*Agreement*"), and agrees to be bound by the terms and conditions of the Agreement as a [Member or Economic Interest Owner].

**ADDITIONAL MEMBER:**

| *For Individuals:* | *For Entities:* |
|---|---|
| Signature: | Name of Entity: |
| Print Name: | By: |
| Date: | Print Name: |
| *and (If Joint Ownership):* | Title: |
| Signature: | Date: |
| Print Name: | |
| Date: | |

*Address for Notices:*

**ACCEPTED AND AGREED:**

CHARTER UP HOLDINGS, LLC

By:
Name:
Title:
Date:

Option grant ES-10 to Thomas Ellis Bragg

# EXHIBIT C

Fulton County Superior Court
***EFILED***TV
Date: 7/7/2023 6:42 PM
Che Alexander, Clerk

**IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA**

THOMAS "ENNIS" BRAGG, JR.,              )
                                        )
        Plaintiff,                      )              2023CV382448
                                        )     Civil Action No. _____
vs.                                     )
                                        )
CHARTERUP HOLDINGS, LLC, ARMIR  )
HARRIS, and LUIS CARRANZA,              )
                                        )     **JURY TRIAL DEMANDED**
        Defendants.                     )
_____)

## COMPLAINT

Plaintiff Thomas "Ennis" Bragg, Jr. ("Bragg" or "Plaintiff") files his Complaint against Defendants CharterUP Holdings, LLC ("CharterUP"), Armir Harris ("Harris"), and Luis Carranza ("Carranza") (collectively the "Defendants"), respectfully showing the Court as follows:

## INTRODUCTION

1.

Forty-three (43) minutes before midnight, when several hundreds of thousands of unit options were set to vest, CharterUP's CEO and CFO executed a cooked-up scheme to terminate Bragg's employment for the purpose of preventing his options from vesting. As if that was not bad enough, they then proceeded to confiscate several hundreds of thousands more already-vested options, under the guise of a manufactured "for-cause" termination. As a result, this action is brought against Defendants ALTERNATIVELY under Delaware law for breach of contract and tortious interference with a contract, assuming the unit option agreement is governed by Delaware law, OR, if the unit option plan at issue is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, then for benefits due under the unit option plan

1

and for Plaintiff's wrongful termination in violation of ERISA.  Plaintiff also seeks his attorneys'

fees for being forced to litigate to seek recovery of the substantial losses he incurred as a result of

Defendants' wrongful actions.

## JURISDICTION AND VENUE

2.

This Court has subject matter jurisdiction over this action pursuant to Article VI, Section

IV, Paragraph I of the Georgia Constitution.  This Court has concurrent jurisdiction over the

ERISA claim pursuant to 29 U.S.C. 1132(e)(1).

3.

Venue properly lies in this court pursuant to O.C.G.A. § 33-4-1 (2) and Article VI, Section

II, Paragraph VI of the Georgia Constitution, because the Defendants are located in Fulton County,

Georgia.

4.

All conditions precedent to the institution of this suit have been fulfilled; Plaintiff has

exhausted all required steps before filing this action, and/or further exhaustion would be futile.

## THE PARTIES

5.

Plaintiff Thomas "Ennis" Bragg, Jr. is a natural person who is now and has been a resident

of the State of Georgia at all times relevant to the facts of this Complaint.

6.

CharterUP Holdings, LLC is a limited liability company formed under the laws of the State

of Delaware.  CharterUP's principal place of business and corporate headquarters is located at

3525 Piedmont Road, Suite 5-210, Atlanta, Georgia 30305, and CharterUP can be served with

process via its registered agent, Armir Harris, at 3340 Peachtree Road NE, Suite 100, Atlanta, GA, 30326.

7.

Defendant Armir Harris is a natural person who is now and has been a resident of the State of Georgia.  Mr. Harris can be served with process at 3340 Peachtree Road NE, Suite 100, Atlanta, GA, 30326 and/or at 3344 Peachtree Road NE, Unit 3904, Atlanta, GA 30326.

8.

Defendant Luis Carranza is a natural person who is now and has been a resident of the State of Georgia.  Mr. Carranza can be served with process at 3344 Peachtree Road NE, Unit 3904, Atlanta, GA 30326.

**FACTUAL BACKGROUND**

9.

Bragg joined CharterUP's predecessor, Shofur, in November 2018 as its Chief Technology Officer.

10.

As an executive of CharterUP, Bragg participated in CharterUP's Executive Incentive Plan.

11.

During Bragg's tenure with CharterUP, Bragg was offered and accepted incentive plan units that vested between January 31, 2021 through October 31, 2022 totaling 660,000 units (this number was reduced in October to 469,057 pursuant to a partial option cancellation agreement, which is not in dispute).  An additional 338,000 incentive plan units that had been offered and accepted by Bragg were scheduled to vest at 12:00 a.m. on January 31, 2023. An additional 1,086,000 units were granted and slated to vest in tranches through January 31, 2024.

3

12.

During his employment with CharterUP, Bragg consistently received positive performance reviews. Indeed, Bragg's most recent performance review was on January 27, 2023 where he received "3" and "3.5" ratings. A "3" rating means that Bragg consistently met expectations and more specifically that his "performance has met expected standards and target dates" and that his "contribution has added value to CharterUP." A "3.5" rating is even higher than the "3" rating whereby not only did Bragg consistently meet expectations, but he also occasionally exceeded expectations. Bragg's performance review was completed by CharterUP CEO Armir Harris.

13.

Bragg's January 27, 2023 performance review included the following positive feedback:

Ennis, trust is not built quickly. It is built over time, and every interaction is an opportunity to earn trust. You have helped transform our company over the years, helped build the early phases of a marketplace with clear product market fit. Your hard work, dedication, and commitment has earned our trust and given us the trust necessary to continue growing CharterUP. We are grateful to have you as a colleague and trusted member of CharterUP.

14.

On January 29, 2023—two calendar days following this positive performance review—CharterUP presented Bragg with a proposed agreement seeking a release from CharterUP's prior agreement with Bragg regarding the vesting of his incentive units (the "Release Agreement"). CharterUP demanded that Bragg sign the Release Agreement by 6:00 p.m. on January 30, 2023—mere hours before Bragg was due to have 338,000 incentive unit options vest. The Release Agreement also sought to have Bragg delay the vesting of his 338,000 units for two quarters and to have him participate in the 2023 Incentive Plan, which was substantially less lucrative than the 2019 Incentive Plan.

4

15.

Bragg, being under no legal obligation to agree to the terms of the Release Agreement, declined to sign the Release Agreement and informed CEO Armir Harris of his decision at 6:11 p.m. on January 30, 2023.

16.

At 11:17 p.m. on January 30, 2023—only forty-three (43) minutes before Bragg's 338,000 options were to vest at 12:00 a.m. on January 31, 2023—CharterUP's CFO Luis Carranza sent Bragg an e-mail terminating Bragg's employment, purportedly "for cause" (though nothing even approximating "cause" was identified, explained, or outlined therein).  The termination e-mail also attached a separation agreement that had obviously been pre-prepared in anticipation of CharterUP's decision to terminate Bragg's employment.

17.

Upon information and belief, CEO Armir Harris made the decision to terminate Bragg's employment and directed and/or conspired with CFO Luis Carranza to carry out Bragg's termination.

18.

Upon information and belief, Defendants intentionally and wrongfully terminated Bragg's employment purportedly "for cause," in order to interfere with Bragg's contractual rights to the vested (and vesting) incentive units granted to Bragg as part of his compensation package.

19.

Bragg's Unit Option Agreement contains that following relevant provisions:

3. **Termination of Option**. Except as provided below in this Section, this Option shall be immediately forfeited, along with any and all rights or subsequent rights related hereto, and may not be exercised after the date which is ninety (90) days after the Optionee's "Termination Date" (the date on which Optionee ceases to be

5

in the Continuous Service (as defined in the Plan) of the Company, or any Parent or Subsidiary), or, if earlier, the Option Expiration Date. Prior thereto, this Option shall continue to be exercisable, but only to the extent that it is vested on the Termination Date. The Managers shall have complete and absolute discretion to determine an Optionee's Termination Date.

(a) *Early Termination for Cause*. If Optionee ceases to perform services for the Company, or any Parent or Subsidiary, for Cause, this Option shall immediately be forfeited, along with any and all rights or subsequent rights related hereto, as of the Optionee's Termination Date, or, if earlier, the Option Expiration Date. For this purpose, "Cause" shall be defined as set forth in a written employment agreement between the Optionee and the Company in existence as of the Grant Date, or, if no such written agreement exists or if "Cause" is not defined in such written employment agreement, "Cause" shall be defined as set forth in the Plan … .

20.

The 2019 Unit Incentive Plan contains the following definition of "Cause":

2.4 **Cause** shall mean an act or acts by an Eligible Recipient involving (a) the use for profit or disclosure to unauthorized Persons of confidential information or trade secrets of the Company, a Parent or a Subsidiary, (b) the breach of any contract with the Company, a Parent or a Subsidiary, (c) the violation of any fiduciary obligation to the Company, a Parent or a Subsidiary, (d) the unlawful trading in the securities of the Company, a Parent or a Subsidiary, or of another entity based on information gained as a result of the performance of services for the Company, a Parent or a Subsidiary, (e) a felony conviction or the failure to contest prosecution of a felony, or (f) willful misconduct, dishonesty, embezzlement, fraud, deceit or civil rights violations, or other unlawful acts.

21.

Bragg committed none of the "cause" infractions outlined in the incentive plan. The purported "for cause" termination was merely a manufactured pretext for the unlawful termination because no "cause" existed as defined by the plan.

22.

Nevertheless, Defendants erroneously characterized their wrongful termination of Bragg as being "for cause" and thereby have taken the position that not only is Bragg not entitled to the vesting of the 338,000 incentive units scheduled to vest just minutes following his termination, but

6

also that he has forfeited all of his 469,057 previously-vested incentive units.

23.

Defendants' erroneous classification of Bragg's termination as being "for Cause" has resulted in CharterUP retaining all of the nearly a million incentive units that rightfully belong to Bragg as well as the cancellation of an additional 1,086,000 units that were slated to vest in tranches over the next calendar year.

24.

Upon information and belief, on or around October 26, 2022, CharterUP underwent a Change in Control event (as defined in the 2019 Unit Incentive Plan) upon the closing of the Series A deal with Tritium Partners, LLC ("Tritium").

25.

The 2019 Unit Incentive Plan contains the following definition of "Change in Control:"

2.5  *Change of Control* means either of the following:

(a) any transaction or series of transactions pursuant to which the Company sells, transfers, leases, exchanges or disposes of substantially all (*i.e.,* at least eighty-five percent (85%)) of its assets for cash or property, or for a combination of cash and property, or for other consideration; or

(b) any transaction pursuant to which Persons who are not current Unit holders of the Company acquire by merger, consolidation, reorganization, division or other business combination or transaction, or by a purchase of an interest in the Company, an interest in the Company so that after such transaction, the Unit holders of the Company immediately prior to such transaction no longer have a controlling (*i.e.*, more than 50%) voting interest in the Company.  . . .

26.

Upon information and belief, the Series A deal with Tritium resulted in the Unit holders of CharterUP immediately prior to the transaction no longer having a controlling (*i.e.*, more than 50%) voting interest in CharterUP.  As such, a Change in Control event took place and the vesting

7

of all of Bragg's unvested incentive units should have been accelerated at that time pursuant to the Acceleration language in Bragg's Unit Option Agreement.

27.

Bragg's Unit Option Agreement contains that following relevant provision:

In the event of a Change of Control as defined in the Charter Up Holdings, LLC 2019 Unit Incentive Plan (the "Plan"), subject to the terms of the Plan, this Unit Option Agreement and the Exercise Agreement, the Optionee shall be entitled to purchase, pursuant to the exercise of this Option, all (100%) of the Units subject to this Option on and after the date of such Change of Control (determined by the Company with respect to this Option and with respect to such Change of Control, but contingent upon the occurrence of the Change of Control) unless Optionee has ceased to be in the Continuous Service (as defined in the Plan) of the Company, or any Parent or Subsidiary prior to such Change.

28.

Upon information and belief, upon the occurrence of the Change of Control event in October 2022, all of Bragg's unvested units should have vested due to the acceleration clause in the 2019 Unit Incentive Plan.

29.

The 2019 Unit Incentive Plan and Option Unit Agreement documents contain two additional potentially-relevant provisions. First, they contain a choice of law provision choosing Delaware law. Second, they contain a provision purporting to disclaim (in certain circumstances that are not clearly applicable here), the application of ERISA law; upon information and belief, the 2019 Unit Incentive Plan and Option Unit Agreement are or may be governed by ERISA. Because it is unclear at this juncture which law applies, the following claims are brought in the alternative.

## COUNT I – BREACH OF CONTRACT

### (Against CharterUP) (Under Delaware Law)

8

30.

Plaintiff incorporates paragraphs 1-29 above as if set forth fully herein.

31.

Under Delaware law, the elements of a breach of contract claim are: (1) a contractual obligation; (2) a breach of that obligation; and (3) resulting damages. *See Foraker v. Voshell*, 2022 Del. Super. LEXIS 282, at *18 (Del. Super. Ct. July 1, 2022).

32.

Per the terms of the 2019 Unit Incentive Plan and the Unit Option Agreement, Bragg was contractually entitled to the vesting of 338,000 units at 12:00 a.m. on January 31, 2023.  CharterUP did not allow the 338,000 units to vest and wrongfully removed 469,057 already vested units from Bragg.

33.

CharterUP's actions of both failing and refusing to allow the 338,000 units to vest as required by the Plan and wrongfully confiscating the 469,057 units from Bragg that had already vested constitutes a breach of its obligation under the 2019 Unit Incentive Plan and the Unit Option Agreement.

34.

CharterUp also failed to accelerate all of Bragg's units upon the Change in Control event that took place in October 2022, thereby breaching provisions of the 2019 Unit Incentive Plan and Bragg's Unit Option Agreement.

35.

CharterUP's breaches have caused Bragg to be damaged, *inter alia*, in the amount of the full value of the vested units, the units that should have vested on January 31, 2023, and the units

9

that should have accelerated pursuant to the Change in Control.  Plaintiff is entitled to damages in an amount to be determined by the enlightened conscience of the factfinder, plus interest thereon.

## COUNT II – TORTIOUS INTERFERENCE WITH CONTRACTUAL RIGHTS

### (Against Defendants Harris and Carranza) (Under Delaware Law)

36.

Plaintiff incorporates paragraphs 1-29 above as if set forth fully herein.

37.

Under Delaware law, to establish a tortious interference with a contract claim there must be: (1) a contract; (2) of which defendant was aware; (3) for which Defendant's intentional act was a significant factor in causing the breach of such contract; (4) without justification; and (5) which caused the Plaintiff injury.  *See Aero Global Capital Mgmt., LLC v. Cirrus Indus.*, 871 A.2d 428, 437 (Del. 2005).

38.

Defendants Harris and Carranza wrongfully terminated Bragg's employment for the purpose of confiscating Bragg's vested and soon-to-vest units, thereby resulting in CharterUP's breach of the 2019 Unit Incentive Plan and the Unit Option Agreement with respect to both Bragg's vested (469,057) and soon-to-vest incentive units.

39.

The 2019 Unit Incentive Plan and Unit Option Agreement are contracts.  Defendants Harris and Carranza were both aware of, but not parties to, these contracts.

40.

Defendants Harris and Carranza's actions—wrongfully terminating Bragg—were intentional and caused CharterUP to breach the 2019 Unit Incentive Plan and Unit Option

10

Agreement with Bragg, without legal justification.

41.

As a result of Defendants Harris and Carranza's actions, Bragg has suffered injury of the loss of the vested shares and the failure to receive those shares due to vest within minutes of Harris' and Carranza's wrongful termination of Bragg.

42.

Defendants Harris and Carranza's actions caused Bragg to be damaged in the full value of the vested units (469,057 units) and the units that should have vested (338,000 units), in addition to back wages, front wages, lost bonus opportunities, and additional units scheduled to vest through January 2024 (1,086,000 units). Plaintiff is entitled to damages in an amount to be determined by the enlightened conscience of the factfinder, including interest.

## COUNT III – ATTORNEYS' FEES

### (Against All Defendants) (Under Delaware Law)

43.

Plaintiff incorporates paragraphs 1-42 above as if set forth fully herein.

44.

Under Delaware law, attorneys' fees may be assessed where the court concludes that a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons. *See Brice v. State of Delaware, Dept. of Corrections*, 704 A.2d 1176, 1178 (Del. 1998).

45.

Defendants have acted in subjective bad faith. Plaintiff sought a resolution of his claims from Defendants prior to filing and initiating this lawsuit, but Defendants refused and forced Plaintiff to enforce these claims, which Defendants know or should know are valid, via litigation.

11

46.

As a result of Defendants' bad faith, Defendants have put Plaintiff to the unnecessary trouble and expense of having to engage counsel and to resort to litigation to enforce his legal rights against Defendants.

## COUNT IV – ERISA SECTION 502(a)(1)(B) – BENEFITS CLAIM

## (Against CharterUP)

47.

This Count is alleged in the alternative to Count I.  Plaintiff incorporates paragraphs 1-29 above as if set forth fully herein.

48.

Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B) allows participants of ERISA plans to enforce plan terms and to require that plan administrators meet their duties to provide plan benefits in accordance with the plan.

49.

CharterUP's actions resulted in Bragg being denied benefits that he was due under the 2019 Unit Incentive Plan and Option Unit Agreement, namely, the vesting of 338,000 units that were scheduled to vest only minutes following CharterUP's wrongful termination of Bragg, and confiscation of his already-vested 469,057 units.

50.

Further CharterUP's actions resulted in further denial of benefits to Bragg whereby his remaining 1,086,000 units, which were slated to vest through January 2024, were not permitted to vest thereby denying Bragg a benefit to which he was entitled under the 2019 Unit Incentive Plan.

51.

Finally, CharterUP's actions resulted in further denial of benefits to Bragg whereby his unvested units were not accelerated, as they should have been pursuant to the Change in Control provisions of the 2019 Unit Incentive Plan.

52.

Due to Defendants' unlawful actions, Plaintiff was injured and is therefore entitled to and seeks all available relief, including but not limited to the benefits denied to him, prejudgment interest, attorneys' fees/costs, and/or further appropriate equitable relief to be determined at trial, for his benefits claim under ERISA § 502(a)(1)(B).

## COUNT V – ERISA SECTION 510 – TERMINATION/INTERFERENCE

### (Against All Defendants)

53.

This Count is alleged in the alternative to Count II.  Plaintiff incorporates paragraphs 1-29 above as if set forth fully herein.

54.

Section 510 of ERISA states, "[i]t shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan[…] or *for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan . . .*"  29 U.S.C. § 1140 (emphasis added).  Section 510 claims are enforced via 29 U.S.C. § 1132(a).

55.

Defendants' purported "for cause" termination of Bragg was done in whole or in part to

13

interfere with Bragg's attainment of the 338,000 units that were slated to vest only minutes after his termination, to interfere with subsequent tranches of units (1,086,000) granted to Bragg and scheduled to vest through January 2024, and to interfere with Bragg's rights to the 469,057 units that had already vested.

56.

Bragg committed none of the "cause" infractions outlined in the incentive plan.

57.

Defendants' discharge of Plaintiff violated ERISA § 510, 29 U.S.C. § 1140 inasmuch as Defendants unlawfully discharged Plaintiff in order to interfere with his attainment of rights to which he was entitled or would become entitled under ERISA.

58.

Due to Defendants' unlawful actions, Plaintiff was injured and is therefore entitled to and seeks all available relief, including but not limited to back pay, front pay, lost benefits, prejudgment interest, attorneys' fees/costs, and/or further appropriate equitable relief to be determined at trial, for his wrongful termination under ERISA § 510.

## COUNT VI – ATTORNEYS' FEES UNDER ERISA SECTION 502(g)

### (Against All Defendants)

59.

This Count is alleged in the alternative to Count III.  Plaintiff incorporates paragraphs 1-29 and 47-58 above as if set forth fully herein.

60.

Title 29 U.S.C. § 1132(g) provides that the Court may award reasonable attorneys' fees and costs of bringing this action.

61.

Defendants' violations of ERISA and acts of bad faith have caused Plaintiff to incur litigation costs and attorney's fees to remedy the breaches herein. This Court should award Plaintiff his reasonable attorneys' fees and the litigation costs and expenses of bringing this action.

62.

Accordingly, Defendants' conduct justifies an award of Plaintiff's expenses of litigation against Defendants, including his attorneys' fees.

WHEREFORE, Plaintiff respectfully demands that he be granted the following relief:

(a)    Equitable and/or injunctive relief, as appropriate, for Defendants' breach of contract, tortious interference with a contract, and ERISA violations;

(b)    Damages in an amount to be determined by the factfinder, for all damage caused by Defendants' breach of contract, tortious interference with a contract, and ERISA violations;

(c)    Reasonable attorneys' fees together with any and all other costs associated with this action pursuant to Delaware law or ERISA; and

(d)    Other and further relief as the Court deems just and proper.

**A JURY TRIAL IS DEMANDED ON ALL ISSUES SO TRIABLE.**

Respectfully submitted this 7th day of July, 2023.

/s/ Nancy B. Pridgen_____
Nancy B. Pridgen, Esq.
Georgia Bar No. 587949
PRIDGEN BASSETT LAW, LLC
138 Bulloch Avenue
Roswell, Georgia  30075
(404) 551-5884 direct
(678) 812-3654 facsimile
nancy@pridgenbassett.com

*Counsel for Plaintiff*

15